# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

**UNITED STATES OF AMERICA,**

    Plaintiff,

    v.

**DARNELL CHIVERS,**

    Defendant.

Case No. 1:19-cr-119

JUDGE DOUGLAS R. COLE

## OPINION AND ORDER

This cause comes before the Court on Darnell Chivers' ("Chivers") Motion to Suppress Evidence (Doc. 19). For the following reasons, Chivers' Motion is **DENIED**.

## FACTUAL BACKGROUND

**A. The Government Intercepts Letters Chivers Sent From Jail Because They Suspect He Is Tampering With A Witness.**

Chivers was housed at the Hamilton County Justice Center from January 3, 2018, through February 18 or 19, 2019, on charges related to his flight from law enforcement on January 3, 2018. (Mot. to Suppress, Doc. 19, #95; Memo. in Opp'n to Def.'s Mot. to Suppress ("U.S. Memo. in Opp'n"), Doc. 24-1, #229). On January 16, 2019, Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") Special Agent Todd Tremaine, Williamsburg Police Chief Wayne Bird, and Williamsburg Police Detective Bobby Freeman traveled to the Detention Center to interview Chivers. (U.S. Memo. in Opp'n at #229; *see also* Mot. to Suppress at #95). These officers were investigating Chivers' involvement in a triple homicide that occurred in Kentucky on September 13, 2017, and if the triple homicide might be connected to Chivers' firearm

possession charges. (U.S. Memo. in Opp'n at #229). During the interview, which was audio recorded, the officers provided Chivers with information about the status of their investigation, including how they believed Chivers obtained a firearm from Kathy Faulkner in Kentucky. (*Id.*).

Chivers claims, "[s]ubsequently, everyday afterwards when the Defendant sent out his sealed letters in the mail, even privileged ones, they were intercepted, ripped open, searched, copied, seized and transferred into a federal agent's hands without the defendant['s] consent or a warrant, and even went as far as contacting the receiver of the envelope and visiting her over the letters." (Mot. to Suppress at #96–97). The Government admits it made copies of Chivers' outgoing mail, but the Government is not aware of Chivers' mail being withheld or rejected, nor of any of Chivers' legal mail, i.e., mail between Chivers and a person acting as his attorney, being inspected by the Detention Center, nor forwarded to Agent Tremaine. (U.S. Memo. in Opp'n at #230–31).

According to the Government, the reason for reviewing Chivers' outgoing mail was that, based on what Chivers said during the January 16 interview, law enforcement had reason to believe that Chivers may attempt to contact and interfere with potential witnesses in their investigation. (*Id.* at #237). As a result of these concerns, Agent Tremaine contacted Hamilton County Sheriff's Department Detective Sergeant Garry Keeton, who worked as the lead jail investigator at the Hamilton County Detention Center. (*Id.* at #229–30). Agent Tremaine informed Sergeant Keeton about the status of the case and explained the need to monitor

2

Chivers' mail to investigate potential witness tampering. (*Id.* at #230). Agent Tremaine requested that the jail provide him with copies of letters that may be related to the case. (*Id.*). Pursuant to this request, Sergeant Keeton and Corrections Officer Jessica Jones emailed Agent Tremaine copies of several mail items, including outgoing letters from Chivers. (*Id.*).

On January 22, 2019, law enforcement interviewed Diana Coleman, one of Chivers' former girlfriends. (*Id.* at #232). Coleman said that Kathy Faulkner, another one of Chivers' former girlfriends, told Coleman that she had purchased a firearm for Chivers. (*Id.*). Coleman's statement corroborated information Faulkner already provided law enforcement. (*Id.*). Coleman thought Faulkner contacted law enforcement in Warren County and told them she (i.e., Faulkner) left a firearm in Chivers' vehicle around May 24, 2017—thereby attempting to claim ownership of the firearm. (*Id.*). This matched what Faulkner previously told law enforcement about how Chivers wrote her a statement she could use to claim ownership of the Hi-Point firearm law enforcement found in Chivers' possession on May 24, 2017. (*Id.* at #232).

**B. Based On Chivers' Letters, The Government Learned Additional Information Potentially Relevant To Witness Tampering Concerns.**

On January 23, 2019, Sergeant Keeton provided Agent Tremaine letters that Keeton had copied at the Hamilton County Detention Center. (Report of Investigation ("ROI"), Doc. 24-5, #258). Chivers sent the originals of these letters to Coleman. (*Id.*). In one of the letters, right after asking Coleman if she had spoken with law enforcement yet, Chivers said:

> I know the way you say something she bought the gun for you. No, not bought, brought the gun to Ohio. See they look at that and charge me with possession. So just saying certain shit gets the feds involved. However their missing a lot to the story. So I will have to bring it out.

(Letters to Coleman, Doc. 24-5, #261).

In another letter, he asked Coleman to review her call history for September 10 through 15. (*Id.* at #260). He said, "[t]hem feds been looking (sic) at phone lines." (*Id.*). In the same letter, he directed her to mail a third letter, written in different handwriting, to "fat boy down there." (*Id.* at #260). This third letter reminds "Hubba" not to talk to the police and to assert his Fifth Amendment privilege. (*Id.* at #263). Based on their investigation, law enforcement believes this third letter was intended for Jeremy Hatfield, who, along with Chivers and Anthony Hester, had been charged with triple homicide in Kentucky state court for the death of three individuals in September 2017. (U.S. Memo. in Opp'n at #233).

The day Agent Tremaine received these letters, he again met with Coleman and showed her the letters. (*Id.*; *see also* ROI at #258). Coleman confirmed the letters were written in Chivers' handwriting and also confirmed that she understood "fat boy" and "Hubba" to refer to Jeremy Hatfield. Agent Tremaine warned her not to mail any letter to "Hubba" that she may receive from Chivers, as that could constitute witness tampering. (U.S. Memo. in Opp'n at #233). Coleman agreed at this meeting to provide law enforcement with Chivers' letters once she received them, but she never followed through. (*Id.*). Coleman later told law enforcement that she had received the letters and thrown them away. (*Id.*).

4

In June 2019, law enforcement analyzed the handwriting from the various letters. Agent Tremaine transferred the copies of Chivers' letters that prison officials made before sending them, a letter Chivers had sent to the United States Attorney's Office for the Eastern District of Kentucky, and the written statement that Faulkner said that Chivers wrote her regarding how she should assert ownership of the firearm, to Forensic Document Examiner Carl R. McClary. (*Id.*). McClary examined the documents and prepared a report. (*See* McClary Report, Ex. E, Doc. 24-6, #264–66). McClary determined that there is a "strong probability" that, based on the handwriting in two of the three letters obtained by the Hamilton County Detention Center and the letter sent to the United States Attorney's Office, that Darnell Chivers did, in fact, draft the written statement to Faulkner. (*Id.* at #264).

Chivers has now filed this Motion to Suppress. (Doc. 19). In it, he argues that any evidence the Government found from reading his outgoing mail should be suppressed because the Government violated his Fourth Amendment rights by doing so. Chivers claims he had an expectation of privacy in his sealed, outgoing mail, and the Government wrongfully intruded on that expectation of privacy without first obtaining a warrant or his consent.

## DISCUSSION

The Fourth Amendment protects individuals from unreasonable searches and seizures. *See* U.S. Const. amend. IV. To show the Government violated the Fourth Amendment by search his outgoing mail, Chivers must establish both (1) that the inspection constituted a "search," i.e., a governmental invasion of a "legitimate

5

expectation of privacy," and (2) that the search was "unreasonable." *Smith v. Maryland*, 442 U.S. 735, 740 (1979). In the detention setting, such as here, the Fourth Amendment inquiry involves a balancing test. Detainees like Chivers do not completely lose an expectation of privacy while in custody, but the Detention Center also has a legitimate interest in protecting security. Here, as more fully described below, because the Government's search was reasonably justified to further that legitimate interest, Chivers fails to establish a Fourth Amendment violation.

The Fourth Amendment inquiry begins by exploring whether the party asserting the right had a reasonable expectation of privacy. This inquiry involves both a subjective and an objective component. First, the defendant must show by his conduct that he had an actual or subjective expectation of privacy. *Id.* That is, the defendant must show that he was "seek[ing] to preserve [something] as private." *Katz v. United States*, 389 U.S. 347, 351 (1967). Once the party establishes that he or she had a subjective expectation of privacy, the question becomes whether that expectation "is one that society is prepared to recognize as 'reasonable.'" *Smith*, 442 U.S. at 740 (quoting *Katz*, 389 U.S. at 361 (Harlan, J. concurring)). Stated alternatively, the question is whether the defendant's expectation, when viewed objectively, is "justifiable" under the circumstances.

Here, Chivers has established that he had a subjective expectation of privacy—he wanted his letter to be private and took steps in an effort to preserve that privacy. But the question still remains as to whether this expectation of privacy, when viewed objectively, is justifiable under the circumstances. The Court finds it is not.

"While a prison inmate is not stripped of constitutional protections at the prison gate, any reasonable expectation of privacy a prison inmate retains is of diminished scope." *United States v. Ligambi*, 886 F. Supp. 2d 492, 495 (E.D. Pa. 2012); *see also Hudson v. Palmer*, 468 U.S. 517, 524 (1984) ("[It is] clear that imprisonment carries with it the circumscription or loss of many significant rights."). These constraints on an inmate's expectation of privacy are "necessary, as a practical matter, to accommodate a myriad of institutional needs and objectives of prison facilities, … chief among which is internal security[.]" *Hudson*, 468 U.S. at 524 (internal quotations and citations omitted). And the constraints apply to pretrial detainees housed in penal institutions, just like inmates there. *See Bell v. Wolfish*, 441 U.S. 520, 557 (1979) ("[G]iven the realities of institutional confinement, any reasonable expectation of privacy that a detainee retain[s] necessarily would be of a diminished scope."). In short, while those housed in penal institutions do enjoy some objective expectation of privacy, that expectation of privacy is necessarily diminished in light of the realities of imprisonment.

To that end, the Supreme Court has long held as a general matter that prison searches of outgoing mail do not violate the Fourth Amendment. *See Stroud v. United States*, 251 U.S. 15 (1919). That is true, so long as the institution gains access to the contents of the mails through an "established practice, reasonably designed to promote the discipline of the institution." *Id.* at 21. Stated more generally, it is "well established that prisons have sound reasons for reading the outgoing mail of their inmates," *United States v. Whalen*, 940 F.2d 1027, 1035 (7th Cir. 1991), and so long

7

as prison officials reviewed the mail at issue for some "sound reason" there is no Fourth Amendment violation. *See United States v. Kelton*, 791 F.2d 101, 103 (8th Cir. 1986) (holding that based on prison officials' reasonable concern for prison security, and because of an inmate's diminished expectation of privacy, prison officials do not violate the Constitution when they read an inmate's outgoing letters).

As this Court has observed, one such "sound reason" to read outgoing prisoner mail can be when officials have a reasonable basis for believing that the institutionalized person may be using his or her outgoing mail to commit new criminal activity, such as intimidating witnesses. *See Loza v. Mitchell*, 705 F. Supp. 2d 773, 882 (S.D. Ohio 2010) (finding "legitimate penological interest for seizing and reading" the inmate's letters when the prison had reason to believe the inmate was attempting to contact a material witness). As the *Loza* Court noted, "[t]he state had an important interest in ensuring [the inmate] was not threatening or intimidating [the witness]." *Id.* at 881.

Other courts have reached this same result. In *United States v. Davila*, the court started from the proposition that "a prison official's decision to open and inspect an inmate's outgoing mail is constitutional so long as it is 'reasonably related to legitimate penological interests.'" 744 F. App'x 842, 843 (4th Cir. 2018) (quoting *Altizer v. Deeds*, 191 F.3d 540, 547 (4th Cir. 1999)). The court went on: "As the Supreme Court has noted, the investigation and prevention of ongoing, illegal inmate activity furthers the legitimate penological objectives of prison security and inmate rehabilitation." *Davila*, 742 F. App'x at 843; *see also Thornburgh v. Abbott*, 490 U.S.

8

401, 411–12 (1989) (noting that "dangerous outgoing correspondence" includes "plans relating to ongoing criminal activity," which pose a "serious threat to prison order and security"); *Procunier v. Martinez*, 416 U.S. 396, 412–13, (1974) (foiling inmates' ongoing criminal activity is a legitimate governmental interest); *Smith v. Delo*, 995 F.2d 827, 830 (8th Cir. 1993) (finding a prison regulation allowing the prison to screen mail for "escape plans, contraband, threats, or evidence of illegal activity" to be reasonably related to the legitimate purpose of maintaining security); *see generally Stroud*, 251 U.S. at 21 (holding that the Fourth Amendment does not prohibit the examination of prisoners' mail).

Such cases doom Chivers' Fourth Amendment claim here. To start, the Hamilton County Detention Center has written policies that inform those housed there that outgoing mail may be inspected, "consistent with the legitimate security needs of each facility." (*See* Procedure Number I.8, Ex. A, Doc. 24-2, #239). Under Section V(A) of this policy, this includes the ability to read an inmate's outgoing mail based on "legitimate jail interests or order and security[.]" (*Id.*).

The Sheriff's Office likewise informs detainees of the prospect that their outgoing mail may be inspected. In the FAQ section of their website, under the "Understanding the Inmate Information FAQ" section, the Sheriff's Office cites "Section 274.96 of the U.S. Postal Service Administrative Support Manual," and states, "[a]uthorized personnel of prisons, jails, or other correctional institutions, under rules and regulations promulgated by the institution, may open, examine and censor mail sent from or addressed to an inmate of the institution or jail." (Website

9

FAQ, Ex. C, Doc. 24-4, #254). In light of these "established policies," Chivers would have, at best, a severely diminished expectation of privacy in any outgoing mail that he voluntarily chose to write and send.

Moreover, the Government has identified a "sound reason," *Whalen*, 940 F.2d at 1035, for inspecting the mail here. In particular, as in *Loza* and *Davila*, the Government had a reasonable suspicion that Chivers may be using outgoing mail to further his criminal activities or intimidate witnesses. Investigators met with Chivers on January 16, 2019, to discuss with him the status of their investigation, including the conversation that they had with a potential witness (Faulkner). Based on Chivers' comments during that interview, the Government reports they believed that Chivers might attempt to contact a potential witness or witnesses in an effort to "interfere with" their testimony (U.S. Memo. in Supp. at #237), which is a crime. *See* 18 U.S.C. § 1512. It was based on those concerns that they asked the officials to monitor Chivers' outgoing mail. While such suspicions may not have been sufficient to establish the "probable cause" needed to support a warrant (an issue the Court does not reach), under the relevant case law that is not the proper question. Rather, given Chivers' diminished expectation of privacy as a pretrial detainee housed in a jail, the only question is whether such concerns provided a "reasonable basis" for the review of his outgoing mail. They did. And that in turn precludes Chivers from prevailing on his Fourth Amendment claim here.

## CONCLUSION

Based on the foregoing, Chivers' Motion to Suppress Evidence (Doc. 19) is **DENIED**.

**SO ORDERED.**

March 23, 2020
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**