# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

**UNITED STATES OF AMERICA,**

     **Plaintiff,**

                              **Case No. 1:19-cv-119**

    **v.**                            **JUDGE DOUGLAS R. COLE**

**DARNELL CHIVERS,**

     **Defendant.**

## OPINION AND ORDER

This cause comes before the Court on Darnell Chivers' ("Chivers") Motion to Dismiss Indictment. (Doc. 21). For the following reasons, Chivers' Motion is **DENIED**.

## FACTUAL BACKGROUND

### A. The Police Pull Chivers Over, Search His Vehicle, Find A Firearm, and Arrest Him.

On May 24, 2017, Troopers with the Ohio State Highway Patrol ("OSHP") were conducting stationary patrol in Warren County, Ohio. (U.S. Memo. in Supp. of Resp. in Opp'n to Mot. to Dismiss ("U.S. Memo. in Supp."), Doc. 23-1, #128; May 24, 2017 Report of Traffic Stop ("OSHP Report"), Ex. A, Doc. 23-2, #156). They observed a vehicle speeding and decided to pull it over. (OSHP Report at #156). Once pulled over, the Troopers found Chivers driving the vehicle with two passengers—Phillip Lee and Tyrone Denny. (*Id.*). The Troopers thought all three men appeared nervous. (*Id.*). Chivers told the Troopers that his name was on the vehicle's rental agreement and that he was traveling to Cincinnati to visit his family. (*Id.*). After a preliminary

review of the rental agreement, the Troopers learned that the vehicle was actually rented to Diana Coleman. (U.S. Memo. in Supp. at #128). Also, Lee and Denny told the Troopers that the men "were headed to the clubs"—a different story from the one Chivers offered. (OSHP Report at #156).

Their different stories drew suspicion, so the Troopers radioed and requested a canine for a free air sniff of the vehicle. (*Id.*). The canine alerted to the vehicle, which led the Troopers to conduct a search of the vehicle's interior. (*Id.*). The Troopers found a Hi-Point Firearm, Model C9, nine-millimeter Luger caliber pistol, bearing the serial number P1385577, inside a size-fourteen Adidas shoe on the rear right floorboard of the vehicle. (*Id.*). The Troopers also found a magazine containing seven nine-millimeter rounds underneath some clothing in the rear passenger seat. (*Id.*).

The Troopers immediately began investigating to determine the gun's owner. At the time of the stop, Chivers, Lee, and Denny were all felons. (U.S. Memo. in Supp. at #129). The Troopers advised all three men of their *Miranda* rights and questioned them about who owned the weapon. (OSHP Report at #156). Chivers admitted he knew the gun was in the vehicle, but claimed the gun belonged to a female passenger who was no longer in the vehicle. (*Id.*). When the Troopers reviewed the audio and video recording from inside the patrol vehicle where Chivers, Lee, and Denny had been placed, the recording captured Chivers saying, "I'm gone, man." (*Id.*). Chivers also said, "the two apart ain't nothing," which the Troopers believed referenced the fact that the firearm and magazine were found in separate locations in the vehicle. (*Id.*). Lee told Chivers, "the only reason I fuck with you is because you a man, I know

it." (*Id.*). When the Troopers asked Lee what he meant about this statement, Lee said he meant that he did not think Chivers would place blame on somebody else for the gun charge. (*Id.*). Ultimately, the Troopers arrested Chivers for having a weapon under disability and improper handling of a firearm and transported him to the Warren County Jail. (*Id.* at #157; *see also* U.S. Memo. in Supp. at #129). He was initially held, but later released.

## B. Chivers' Former Girlfriend's Daughter, Son-In-Law, And Grandson Are Found Murdered.

On August 17, 2017, police officers from Whitley County, Kentucky, responded to a disturbance call at Kathy Faulkner's residence. (*Id.*). Faulkner, one of Chivers' girlfriends, wanted Chivers removed from her property. (*Id.* at #129, 131). Police officers took Chivers back into town but did not arrest him. (*Id.* at #129). Later that night, Whitley County police officers received a report from Chivers and Diana Coleman, another one of Chivers' girlfriends, that Faulkner had stolen a vehicle from them. (*Id.*). While addressing the situation, law enforcement observed two men (later determined to be Anthony Hester and Jeremy Hatfield) exit Faulkner's vehicle and join Chivers and Coleman. (*Id.*). Later during their investigation, the officers learned this alleged car-theft situation had involved a significant confrontation between Faulkner's and Chivers' associates. (*Id.* at #130).

The next month, on September 13, 2017, Whitley County police officers again responded to a 911 call from the Faulkner residence. Upon arriving, the officers found that Faulkner's daughter, son-in-law, and sixteen-year-old grandson had been strangled to death with zip ties. (*Id.*). A complex murder investigation ensued,

beginning with the Whitley County Sheriff's Office, continuing with the Williamsburg Police Department, and eventually joined by the Bureau of Alcohol, Tobacco, and Firearms ("ATF"). (*Id.*).

While the police were investigating, Chivers was subsequently arrested in January 2018 on unrelated charges after a car chase in Hamilton County, Ohio. He has been detained on multiple charges since that time.

## C. Law Enforcement Investigates Who Owned The Firearm From The Traffic Stop and Who Committed the Murders—Both Investigations Lead To Chivers.

Law enforcement interviewed Chivers on January 30, 2018, at the Hamilton County Detention Center. (*Id.*; Compl. & Aff. EDKY, Ex. E, ¶ 17, Doc. 23-6, #194). The interview was audio recorded. (U.S. Memo. in Supp. at #131). During the interview, Chivers admitted that he went to Faulkner's residence in August 2017, but denied participating in the murder. (Compl. & Aff. EDKY at ¶¶ 17–18, #194).

Officers subsequently questioned Chivers' former girlfriends about the firearm. During an interview police conducted in connection with the murder investigation, the police learned that Faulkner had purchased a Hi-Point pistol for Chivers at a flea market in London, Kentucky, in the spring of 2017. (*Id.*). Faulkner also told police she knew that Chivers had been arrested in Ohio with the firearm about a week after she had purchased it for him in Kentucky (presumably a reference to the May 2017 arrest). (*Id.*; ATF Report of Investigation ("ATF Report"), Doc. 23-2, #148). She said Chivers wrote her a letter that contained a statement he wanted Faulkner to use to tell law enforcement that she owned the Hi-Point Firearm so that

Chivers could avoid conviction in Ohio state court. (U.S. Memo. in Supp. at #130). Another witness told law enforcement that she had seen Chivers with the firearm Faulkner bought him in Kentucky. (*Id.*). An ATF trace revealed that the firearm law enforcement seized from Chivers on May 24, 2017, had been sold in Kentucky. (*Id.*; ATF Report at #148).

Later, on January 22, 2019, law enforcement questioned another former girlfriend—Diana Coleman. (U.S. Memo. in Supp. at #131). Coleman said that Faulkner told Coleman she purchased a firearm for Chivers. (*Id.*). Coleman thought that Faulkner had contacted Warren County law enforcement and told them that she left a firearm in Chivers' vehicle around May 24, 2017. (*Id.*). Coleman said she still had some of Chivers' property in storage—one piece of property included a pair of Chivers' shoes, which were a size fourteen. (*Id.*). The officers found the firearm in a size-fourteen Adidas shoe in the vehicle Chivers was driving. (OSHP Report at #156).

After this interview with Coleman, ATF Special Agent Todd Tremaine received copies of letters that Chivers had sent from the Hamilton County Detention Center addressed to Coleman.[1] (U.S. Memo. in Supp. at #131). In one of those letters, Chivers wrote: "I know the way you say something she bought the gun for you. No not bought, brought the gun to Ohio. See they look at that and charge me with possession. So just saying certain shit gets the feds involved." (*Id.* at #131–32). The Government subsequently charged Chivers with possession of the firearm.

---

[1] Those letters are also the subject of a motion to suppress that Chivers filed.

**D.** **The Government Indicts Chivers In The Eastern District Of Kentucky And The Case Is Delayed Several Times.**

On January 24, 2019, the Government indicted Chivers under 18 U.S.C. § 922(g)(1) in the Eastern District of Kentucky for possessing a firearm in that District between May 20, 2017, and May 24, 2017, as a convicted felon. (Mot. to Dismiss Indictment ("Mot. to Dismiss"), Doc. 21, #104; U.S. Memo. in Supp. at #132). The prosecution's theory was that the firearm Chivers possessed at the time of the May 24, 2017 traffic stop in Ohio had come into Chivers' possession in Laurel County or Whitley County, Kentucky. (U.S. Memo. in Supp. at #132). The case was assigned to Judge Boom and referred to Magistrate Judge Ingram. Chivers had his initial appearance before Judge Ingram on February 28, 2019. (*Id.*). Judge Ingram appointed Chivers an attorney, Andrew Stephens, and set trial for April 30, 2019. (*Id.*). Chivers' speedy trial clock started ticking on March 1, 2019—the day after his initial appearance.

The clock stopped on April 16, 2019, because Chivers' counsel requested a continuance to provide him additional time to review discovery and prepare a motion to suppress. (*Id.*). Judge Boom granted the motion on April 17, 2019, excluding from speedy trial calculations the time between the current trial date, April 30, 2019, and the new trial date, June 18, 2019, based on 18 U.S.C. §§ 3161(h)(7)(A) and (h)(7)(B)(i). (*See* Apr. 17, 2019 Continuance Order EDKY ("Apr. Continuance"), Ex. F, Doc. 23-7, #198–200). Because the tolling that Judge Boom specified did not begin until April 30, Chivers' clock ran from April 18, 2019, through April 29, 2019, but then stopped until June 18, 2019.

During the time that the clock was stopped, on May 30, 2019, Chivers' counsel filed a motion to suppress. The next day, the Government sought a continuance to allow that motion to be resolved. On June 4, 2019, the court granted the motion and excluded the time between the then-current trial date, June 18, 2019, and the new trial date, August 20, 2019, based on 18 U.S.C. §§ 3161(h)(7)(A), (h)(7)(B)(i), and (h)(7)(B)(iv). (*See* June 4, 2019 Continuance Order EDKY, Ex. G, Doc. 23-8, #201–03). The judge found that failure to grant the Government's continuance would deny Chivers' counsel and the Government "the reasonable time necessary for effective preparation, taking into account the exercise of due diligence, due to the evidentiary hearing scheduled on the pending Motion to Suppress." (*Id.* at #202).

While Chivers' case was pending, the Government discovered more evidence about the firearm sale. On June 13, 2019, ATF agents recovered records from Square Deal Pawn and Gift, a Federal Firearms Licensee that had gone out of business. (U.S. Memo. in Supp. at #133). The records reflected that the Hi-Point pistol, which had been manufactured in Ohio, had been sold to a customer in Irvine, Kentucky, in 2008. This corroborated the ATF's trace and served as proof, independent of Faulkner's statements, of an interstate nexus, i.e., that the firearm crossed a state line before the May 24, 2017, traffic stop. (*Id.*). This helped bolster the federal case against Chivers.

At Chivers' request, Judge Ingram conducted attorney dissatisfaction hearings on June 6, 2019 and July 11, 2019. The court excluded the Government's attorney from the attorney dissatisfaction portion of these hearings. (U.S. Memo. in Supp. at

#133). Judge Ingram also conducted a *Faretta* hearing on July 11, 2019. (*See id.* at #133–34).

On July 24, 2019, the Government filed a superseding indictment against Chivers, slightly modifying the language to reflect a recent Supreme Court decision. (*Id.* at #134). Two days later, on July 26, 2019, Chivers' counsel requested a continuance. (*Id.*). Judge Boom granted the motion on August 6, 2019, and excluded the time between the then-current trial date, August 20, 2019, and the new trial date, November 5, 2019, based on 18 U.S.C. §§ 3161(h)(7)(A), (h)(7)(B)(i), and (h)(7)(B)(iv). (*See* Aug. 6, 2019 Continuance Order EDKY ("Aug. Continuance"), Ex. I, Doc. 23-10, #207–09).

In August 2019, while the Government prepared for trial against Anthony Hester for gun charges, the Government discovered that its ability to prove that Chivers had possessed the gun in Kentucky was lessening. In the course of its trial preparations, the Government received a copy of Faulkner's Kentucky state grand jury testimony. (U.S. Memo. in Supp. at #134). Before the state grand jury, Faulkner testified under oath about her involvement with drugs. (*Id.*). Her testimony was inconsistent with what she told the ATF. (*Id.*). When the Government confronted Faulkner about this inconsistency, Faulkner admitted that she lied to the state grand jury. (*Id.*). The Government decided not to call Faulkner at Hester's trial because of her weakened credibility. Plus, on August 31, 2019, law enforcement located Charles Elliot, the person that Faulkner identified as the vendor who sold her the Hi-Point pistol in London, Kentucky. (*Id.*). Elliot said he took medicine for memory issues and

that he did not remember Faulkner or Chivers. (*Id.*). Thus, the Government started considering whether to pursue charges against Chivers in Ohio, where they had the May 22, 2017 traffic stop to substantiate that he possessed the firearm there.

On September 24, 2019, the federal court in Kentucky held a renewed attorney dissatisfaction hearing, from which the Government attorney was again excluded, and also a renewed *Faretta* hearing, for which the United States was present. (*Id.*). During the *Faretta* hearing portion of that proceeding, Chivers made comments implying that he believed he should not be indicted in Kentucky on charges related to a gun found during a traffic stop in Ohio. On the record, Chivers said:

> And with the trial, I have a right to have a trial in the jurisdiction the case happened, as well, because, why I say that, the mixing up of a Ohio traffic stop, a gun found in Ohio, doesn't have nothing to do with London, Kentucky on May 20 and 21.

(*Id.* at #142–43).

After completing the *Faretta* colloquy, Judge Ingram allowed Chivers to proceed pro se. (*Id.*). Chivers then withdrew the motion to suppress his attorney had previously filed. Chivers filed a motion to dismiss the indictment on September 30, 2019. He filed his own motion to suppress and a motion for extension of time to file more defensive motions on October 9, 2019. (*Id.*).

The Government eventually decided to pursue its felon-in-possession charge against Chivers in Ohio rather than Kentucky. Thus, on October 2, 2019, the United States Attorney for the Southern District of Ohio requested a grand jury in this District to indict Chivers. (Mot. to Dismiss at #105). The indictment charged the same crime, 18 U.S.C. § 922(g)(1), based on possession of the same gun, but this time

possession of that gun in Ohio, for which, as noted above, the Government had evidence arising from the traffic stop. Andrew Trimble, the same prosecutor from the Eastern District of Kentucky case, was appointed as a Special Assistant United States Attorney in the Southern District of Ohio case. (U.S. Memo. in Supp. at #135).

Having obtained an indictment in Ohio, on October 16, 2019, the Government moved to dismiss the indictment in the Eastern District of Kentucky without prejudice. (*Id.*). On October 29, 2019, Judge Bloom scheduled a hearing on the Government's motion to dismiss for November 5, 2019, vacated Chivers' trial date, and excluded the time between October 16, 2019, and November 5, 2019, pursuant to 18 U.S.C. § 3161(h)(1)(D). (Oct. 29, 2019 Continuance Order EDKY ("Oct. Continuance"), Ex. J, Doc. 23-11, #210–11). During the November 5th hearing, Judge Boom granted the Government's motion to dismiss the indictment against Chivers in the Eastern District of Kentucky without prejudice.

### E. Chivers' Case Proceeds In The Southern District of Ohio.

Chivers made an initial appearance on the Ohio indictment before a magistrate judge in the Southern District of Ohio on November 12, 2019. (Doc. 8). At that initial appearance, Chivers moved to represent himself. After a brief, informal colloquy, the magistrate judge agreed to let him do so, at least for purposes of entering a not guilty plea, and appointed Richard Monahan from the Federal Public Defender's Office as standby counsel. (Doc. 8). She then ordered the case to "proceed to the docket of Judge Barrett for all further proceedings." (*Id.*; *see also* Tr. of *United States v. Chivers*, No. 1:19-cr-119, Doc. 36, #418–419). As the first order of business on those further

proceedings, on November 19, 2019, Judge Barrett scheduled a *Faretta* hearing for December 2, 2019, to determine whether to grant Chivers' motion to proceed pro se for the remainder of the matter. (Doc. 12). After conducting a full-blown *Faretta* hearing, the judge determined that Chivers had made a voluntary, fully informed decision to represent himself, and appointed Mr. Monahan as standby counsel for the case.

Once Chivers had been authorized to act as counsel, Chivers at that same hearing then requested 60 days to file defensive motions. The judge discussed the speedy-trial implications with Chivers on the record, and all parties agreed to set February 24, 2020, as the new trial date. Judge Barrett gave Chivers until February 3, 2020, to file his motions. (*Id.*). Subsequently, on January 9, 2020, Chivers' case was reassigned to the undersigned judge. (Doc. 16).

Between January 27, 2020, and January 31, 2020, Chivers filed a series of motions. One of those motions was the instant Motion to Dismiss.

## DISCUSSION

In his Motion to Dismiss, filed January 28, 2020, Chivers argues that the indictment against him in the Southern District of Ohio should be dismissed on four separate grounds: (1) vindictive prosecution, (2) selective prosecution, (3) the Government's interference with his right to counsel, and (4) a violation of his speedy trial rights. The Court addresses, and ultimately rejects, each below.

## A.     Vindictive Prosecution.

Chivers argues the Eastern District of Kentucky prosecutor pursued charges against him for vindictive reasons. Because Chivers has provided the Court no plausible basis to support his claim that the prosecutor acted vindictively, Chivers' claim fails.

There are two ways a defendant can establish prosecutorial vindictiveness. A defendant can show either (1) "actual vindictiveness" by producing "objective evidence that a prosecutor acted in order to punish the defendant for standing on his legal rights," or (2) "a realistic likelihood of vindictiveness." *Bragan v. Poindexter*, 249 F.3d 476, 481–82 (6th Cir. 2001). Attempting to prove the former, "actual vindictiveness," has been characterized as "exceedingly difficult" and an "onerous burden." *Id.* at 483.

Chivers does not seek to meet that "onerous burden" here. Rather, he appears to proceed on the "realistic likelihood" theory. Under that theory, a defendant must establish: (1) the exercise of a protected right, (2) the prosecutor's "stake" in the exercise of that right, (3) the unreasonableness of the prosecutor's conduct, and (4) that the prosecution was initiated with the intent to punish the defendant for the exercise of the protected right. *United States v. Dupree*, 323 F.3d 480, 489 (6th Cir. 2003).

If a defendant establishes the first three of those four prongs, then in all likelihood, the fourth prong is met, too. That is, the defendant would then have established the required "likelihood of vindictiveness." *United States v. Suarez*, 263 F.3d 468, 479 (6th Cir. 2001). Accordingly, a court may then "presume an improper

vindictive motive[.]" *Bragan*, 249 F.3d at 481. If this presumption arises, then "the government bears the burden of disproving it or justifying the challenged state action." *Id.*

"Invoking a presumption of vindictiveness in a pretrial setting, though possible, … is necessarily difficult." *United States v. Rosse*, 716 F. App'x 453, 462 (6th Cir. 2017). That is because "a defendant before trial is expected to invoke procedural rights that inevitably impose some 'burden' on the prosecutor." *Suarez*, 263 F.3d at 479–80 (quoting *United States v. Goodwin*, 457 U.S. 368, 381 (1982)). "It is unrealistic to assume that a prosecutor's probable response to such motions is to seek to penalize and to deter." *Id.* at 480.

In an effort to satisfy the "realistic likelihood" approach to proving vindictiveness, Chivers argues that the Government retaliated against him by indicting him in the Southern District of Ohio after he exercised his right to self-representation, filed motions, and sought a trial in the Eastern District of Kentucky. (*See* Mot. to Dismiss at #107). Chivers also alleges that AUSA Trimble "had a personal stake in avoiding trial in Kentucky" because Trimble had only false testimony to prove his case in Kentucky. (*Id.* at #108). Trimble "couldn't face the public [and] the courts and continue to present a lo[]sing case[.]" (*Id.*). Thus, Chivers says, Trimble requested to have the case moved to the Southern District of Ohio. (*Id.*).

While Chivers can meet the first prong of the four-part test by showing he exercised a protected right, Chivers is unable to meet any of the others. As to the first prong, there is no question (indeed the Government agrees) that Chivers exercised

protected rights, namely his right to self-representation and his right to defend himself by testing the Government's evidence and filing motions. (*See* U.S. Memo. in Supp. at #137). But, beyond that, Chivers struggles to make the necessary showings. He faces particular difficulty establishing the second prong—that the Government has any "stake" in deterring Chivers from exercising his rights. Chivers representing himself or filing pretrial motions imposes, at most, a minimal burden on the Government. Chivers' motions do not "clearly require increased expenditures of prosecutorial resources[,]" but instead "were merely garden-variety pretrial motions of the kind found not to burden the prosecution in *Suarez*, … which involved motions to dismiss the indictment and suppress evidence." *Rosse*, 716 F. App'x at 462–63. Chivers fails to show any reason why the Government would care about—i.e., have a "stake in"—Chivers proceeding pro se or filing "garden variety" pretrial motions.

To the extent Chivers seeks to meet this prong by instead arguing that the Government had a stake in moving the forum from Kentucky to Ohio, where the evidence was stronger, this argument also misses the mark. If the Government adjusted its charging decision based on changing evidence and circumstances, not because the defendant exercised his protected rights, then the defendant cannot say the Government acted vindictively. *See, e.g.*, *Suarez*, 263 F.3d at 480 (noting the prosecution can successfully rebut a presumption of vindictiveness by showing that additional charges in a superseding indictment were brought based on new evidence); *see also United States v. Branham*, 97 F.3d 835, 850 (6th Cir. 1996) (noting that "at

the pretrial stage of the proceedings, the prosecutor's assessment of the proper extent of prosecution may not have crystallized") (quotation omitted).

That is exactly what appears to have happened here. As the investigation developed, the Government's evidence in the Eastern District of Kentucky weakened, and the evidence in the Southern District of Ohio strengthened. After Chivers was indicted in the Eastern District of Kentucky, the Government learned that a key witness, Faulkner, had made a prior inconsistent statement under oath before a grand jury, which weakened her credibility. (U.S. Memo. in Supp. at #138). Plus, the Government discovered that the individual who sold Faulkner the firearm in Kentucky suffered from memory issues. (*Id.*). Simultaneously, the Government located records that showed the Hi-Point firearm traveled in interstate commerce before it was seized in the Southern District of Ohio. Thus, while the Government lost witnesses in Kentucky, it gained documentary evidence to advance its case in Ohio. This suggests that the Government decided to indict Chivers in the Southern District of Ohio based on the evolving evidence, not "vindictiveness."

Third, Chivers fails to show that the Government acted unreasonably in its role as prosecutor. To the contrary, as described above, the Government acted reasonably in indicting Chivers in Ohio considering the changing evidence. Nor did the Government seek to increase Chivers' criminal exposure in response to his exercise of his protected rights. Both before and after Chivers exercised his rights, the charges against him remained the same—a single count of violating 18 U.S.C.

§ 922(g)(1). While the date and location underlying those charges changed, the charging decision stayed consistent.

Nor was it unreasonable for the Government to file a superseding indictment in the Eastern District of Kentucky while the Government was pursuing its case there. Generally, in order to be considered vindictive, a superseding indictment "must add additional charges or substitute more severe charges based on the same conduct charged less heavily in the first indictment." *Suarez*, 263 F.3d at 480. Here, as already noted, the charges stayed the same. The Government simply changed some phrasing to comport with Supreme Court precedent. (*Compare* Indictment EDKY, Ex. C, Doc. 23-4 *with* Superseding Indictment EDKY, Ex. H, Doc. 23-9).

In sum, Chivers failed to bring forth any evidence even suggesting, let alone showing, that the Government vindictively prosecuted him. To be sure, Chivers exercised his rights in an effort to defend himself, much like any criminal defendant does, but he has failed to show that the Government had any "stake" in prosecuting Chivers for exercising those rights, or that the Government acted unreasonably by pursuing charges against him in Ohio in light of the developing evidence.

## B.  Selective Prosecution.

Chivers separately argues the Government prosecuted him based on his race and requests an evidentiary hearing to present evidence regarding that contention. Because the Court finds that Chivers has failed to establish a plausible claim that the Government pursued charges against Chivers for anything other than legitimate reasons, Chivers' argument fails. No hearing is necessary.

"A selective-prosecution claim is not a defense on the merits to the criminal charge itself, but an independent assertion that the prosecutor has brought the charge for reasons forbidden by the Constitution." *United States v. Armstrong*, 517 U.S. 456, 463 (1996). Those prohibited reasons include race, religion, or the desire to prevent the defendant from exercising his constitutional rights. *United States v. Edwards*, 783 F. App'x 540, 546 (6th Cir. 2019).

The Sixth Circuit has two tests for selective prosecution. The first is a somewhat lower threshold that a defendant must clear to obtain an evidentiary hearing. The second is the more stringent standard a defendant must meet in order to succeed on the actual claim. Chivers fails to meet either.

### 1. Chivers Has Not Shown He Is Entitled To An Evidentiary Hearing.

To be entitled to an evidentiary hearing, a defendant must make a prima facie showing that: (1) he was singled out for prosecution while others similarly situated have not been prosecuted for the same type of conduct, and (2) the government discriminatorily selected him in bad faith (i.e. based on an impermissible reason like race or religion). *United States v. Bustamante*, 805 F.2d 201, 202 (6th Cir. 1986). A court should only hold an evidentiary hearing when the defendant has proven a "colorable entitlement" to dismissal for selective prosecution. *Id.*

Chivers fails to meet the first prong—that he was singled out when other similarly situated individuals were not prosecuted for the same conduct. The sole argument that Chivers presses in this regard is that he was "similarly situated" to one of the other two passengers in the vehicle (Lee), who was also a felon, but that

Chivers was "singled out" for prosecution because he is African-American, while Lee is Caucasian.

On the evidence here, though, Chivers and Lee were not "similarly situated." The Government had significant evidence to tie Chivers to the firearm when the Government indicted him: (1) Chivers drove the vehicle where officers found the firearm; (2) Chivers told the arresting officers that his name was on the vehicle's rental agreement;[2] (3) Chivers indicated that he had knowledge that the firearm was in the vehicle; (4) Chivers discussed with Lee and Denny while sitting in the police cruiser the likely consequences for him of law enforcement finding the firearm; (5) Lee and Denny denied owning the firearm; (6) Lee told law enforcement that Chivers made a statement indicating that Chivers would not let others take the blame for a firearm charge that was rightfully attributed to Chivers; (7) Faulkner identified the Hi-Point firearm as the same one she purchased for Chivers; (8) another witness saw Chivers at Faulkner's residence with a pistol that the witness knew Faulkner had purchased for Chivers; (9) Faulkner gave law enforcement a letter that Chivers wrote to her urging her to tell law enforcement she owned the Hi-Point pistol; (10) Coleman knew that Faulkner had purchased a firearm for Chivers; and (11) law enforcement discovered Chivers wears a size-fourteen shoe (and law enforcement found the Hi-Point firearm inside a size-fourteen shoe in the rental vehicle). (U.S. Memo. in Supp. at #139–40).

---

[2] Rental car records Chivers produced in discovery indicated that the rental vehicle was rented in Diana Coleman's name, but Chivers was an authorized driver. (U.S. Memo. in Supp. at #128 n.2).

In contrast, the only evidence tying Lee to the firearm was simply being present in the vehicle where the gun was located. (*Id.* at #140). Given the weight of the evidence, it makes sense the Government indicted Chivers for the crime, and not Lee. *See Edwards*, 783 F. App'x at 546 (finding it "highly unremarkable" in a selective prosecution claim that the "government indicted only the person against whom the government had the strongest case"). Thus, they are not "similarly situated," such that charging Chivers, instead of Lee, would give rise to a presumption of selective prosecution.

Alleged similarities between Chivers and Lee in terms of criminal history are not enough to change this result. To be sure, the Sixth Circuit has found a co-defendant's criminal history and the incriminating evidence against each defendant to be relevant when determining if they are similarly situated. *See United States v. Wheeler*, No. 96-6230, 1997 WL 685414, at *4 (6th Cir. Oct. 29, 1997). And here, to Chivers' credit, both he and Lee seem to have at least somewhat similar criminal pasts. Chivers' criminal history includes convictions for first-degree aggravated robbery, armed robbery, inducing panic, and breaking and entering. (U.S. Memo. in Supp. at #141). Lee, meanwhile, was convicted of burglary in 1994 and perjury in 1998. (*See* NCIC of Denny and Lee_Redacted, Ex. K, Doc. 23-12, #219–24). But, even if those histories could be characterized as similar, the weight of the substantive evidence described above undeniably makes Chivers different from Lee for purposes of deciding whom to prosecute.

Because Chivers failed to make a plausible showing that the Government singled him out and failed to prosecute similarly situated individuals for similar conduct, he is not entitled to an evidentiary hearing.

### 2. Chivers Has Not Established The Merits Of His Selective Prosecution Claim.

In order to succeed on the merits of the selective prosecution claim itself, Chivers must present "clear evidence" that (1) "the government had a discriminatory intent" and (2) that "the prosecutorial policy had a discriminatory effect." *Edwards*, 783 F. App'x at 546. Chivers fails to make either showing.

All the same points described above regarding Chivers' request for an evidentiary hearing also go to show that Chivers cannot carry the heavier burden required to succeed on the merits. First, there is no evidence the Government had a discriminatory intent. As explained above, the Government did not single Chivers out for prosecution based on his race. Instead, they charged Chivers because of the weight of the evidence indicating he committed the crime. Second, Chivers has not shown that the prosecutorial policy had a discriminatory effect. Chivers does not even point to a particular prosecutorial policy in this case. Because Chivers has provided no "clear evidence" to show selective prosecution, his claim fails.

## C. Right To Counsel.

Chivers next alleges the Government interfered with his right to counsel. But, because the Government never intruded into Chivers' attorney-client relationship, Chivers' argument falls short.

"In all criminal prosecutions, the accused shall enjoy the right … to have the assistance of counsel for his defense." U.S. Const. amend. VI. To establish a Sixth Amendment violation based on the government's interference with an attorney-client relationship, the defendant must show both that the government impermissibly intruded into the attorney-client relationship and that the intrusion prejudiced the defendant. *See Sanborn v. Parker*, 629 F.3d 554, 576 (6th Cir. 2010) (citing *Weatherford v. Bursey*, 429 U.S. 545, 550–59 (1977)). Because Chivers cannot show the Government impermissibly intruded into his attorney-client relationship, he necessarily cannot show that he was prejudiced by such an intrusion.

Chivers claims the Government intruded on, or surveilled, *ex parte* hearings in which he, the judge, and his defense attorney were present. Chivers claims that during these closed meetings in the Eastern District of Kentucky, he discussed how he believed he should not be prosecuted in Kentucky for a traffic stop that occurred in Ohio. (Mot. to Dismiss at #107, 113). Because he says these statements occurred only in hearings that ostensibly took place outside the Government's presence, he argues that the only way the Government could know he had issues with proceeding to trial in Kentucky was by listening in on those closed hearings. (*Id.* at #113).

The docket reflects that the hearings to which he refers were in fact closed to the public and the Government, and the docket contains no indication that the Government was present at them. (U.S. Memo. in Supp. at #142–43; *see also, e.g.*, EDKY Docket, Ex. D, Doc. 23-5, #177 ("MINUTE ENTRY for ATTORNEY APPOINTMENT HEARING as to Darnell Chivers held on 6/6/19 … . The Court then

conducted a closed hearing.")). But, the "evidence" to which Chivers points as support for his claim that the Government was surreptitiously present at those closed hearings—i.e., the Government's knowledge of Chivers' desire to be tried in Ohio rather than Kentucky—in fact lends no support to his allegation. That is so because, as the Government points out, Chivers made such statements on the record *at hearings at which the Government was in fact present* (and properly so). *See* Tr. of *United States v. Chivers*, 6:19-CR-04 (No. 50) (E.D. Ky. Aug. 5, 2019) ("I have a right to have a trial in the jurisdiction the case happened … because … a gun found in Ohio[] doesn't have nothing to do with London, Kentucky (sic)[.]").[3]

Because Chivers has failed to provide any evidence that the Government impermissibly intruded into his attorney-client relationship, Chivers cannot sustain his asserted Sixth Amendment violation.

## D.    Speedy Trial Rights.

Finally, Chivers argues that the speedy trial clock has expired and this Court should dismiss the indictment with prejudice. While, for the reasons discussed below,

---

[3] In his Reply, Chivers claims he cannot respond to the Government's use of this quote from the September 24, 2019, hearing because he has not been able to listen to the recording. (*See* Reply to Gov't's Resp. to Def.'s Mot. to Dismiss ("Def.'s Reply"), Doc. 29, #329–30). The Government says Chivers requested a copy of the recording on January 13, 2020, and he was provided a copy by the clerk the next day. (U.S. Memo. in Supp. at #143 n.12). Chivers indicates he did receive the recording, but says, "[i]ts the middle of February and Chivers still haven't [sic] listened to them. Chivers was advised he could listen to them after his deadline." (Def.'s Reply at #329). Chivers fails to explain who told him he could not listen to the recording, and what deadline he refers to. Without more explanation, the Court assumes Chivers had access to the recording and had the ability to respond to the Government's argument.

the speedy trial clock issue is perhaps a closer call, the Court finds there is still time left on the clock, and thus Chivers' argument fails.

The Sixth Amendment requires that, "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." U.S. Const. amend. VI. The Speedy Trial Act strengthens this mandate by imposing strict time limits for completing various stages of a federal criminal prosecution. *See* 18 U.S.C. §§ 3161– 74. Generally, the Speedy Trial Act requires that a defendant's trial occur within 70 days after a defendant's initial appearance or after the indictment is filed, whichever happens last. *See id.* at § 3161(c)(1). If that does not occur, and the Act does not excuse the delays beyond the 70-day window, the Act requires the court to dismiss the case on the defendant's motion. *See id.* at §§ 3162(a)(1)–(2). While dismissal is required, the Act gives the court discretion to dismiss the case either with or without prejudice, based on a variety of factors that the court must consider in making that decision. *Id.*

The Act sets forth several circumstances where time is automatically excluded from the speedy trial clock calculations. *See id.* at § 3161(h)(1). One example of an automatic exclusion is when a party files a pretrial motion. When that occurs, the time required for the court to gather all the materials necessary to decide the motion is automatically excluded. *See id.* at § 3161(h)(1)(D). Once the court takes the motion under advisement, the Act provides the court 30 days of excludable time in which to decide the motion. *See id.* at § 3161(h)(1)(H). The Act also allows the court to exclude periods of time if the court finds "the ends of justice served by taking such action

outweigh the best interest of the public and the defendant in a speedy trial." *See id.* at § 3161(h)(7)(A).

Also relevant here, the Speedy Trial Act specifically outlines rules for computing time when a case is dismissed and a defendant is subsequently re-indicted. *See id.* at § 3161(h)(5). "When the government asks the court to dismiss an indictment, the 70-day clock is tolled, not reset, if the government files the same charges again." *United States v. Myers*, 666 F.3d 402, 406 (6th Cir. 2012) (citing 18 U.S.C. § 3161(h)(5)). Courts agree that the clock is merely tolled when a court grants the government's motion to dismiss without prejudice, and the government files the same charges against the defendant in the same jurisdiction. *See, e.g.*, *id.* Thus, had the Government here re-indicted Chivers in the Eastern District of Kentucky for the same charge in connection with the May 2017 incident, the speedy trial clock would have picked up where it left off. However, neither the statute nor, it appears, the Sixth Circuit, has addressed the speedy-trial clock implications where, as here, a defendant is indicted on the same charge, on substantially similar facts, in a different jurisdiction.

One could argue, for example, that the Southern District of Ohio indictment is new, and different, from the Kentucky indictment, as some of the facts (e.g., where the gun was possessed) are different, and thus the new indictment should give rise to a new 70-day clock. At the same time, though, the indicted charge (§ 922(g)(1)) and the firearm giving rise to that charge are exactly the same, and the date on which the possession allegedly occurred is basically the same, suggesting the Ohio indictment

is a form of re-indictment for the same offense that the Government voluntarily dismissed in Kentucky. But even then, one could argue that because the new indictment occurred in a different district, it is per se not a re-indictment for purposes of the Speedy Trial Act, but rather gives rise to a new clock.

These are admittedly thorny questions, but the Court need not answer them here, as even assuming Chivers' time from Kentucky rolls over to Ohio, there is still time left on Chivers' clock. The analysis of that issue begins with the Government's concession that, if the Kentucky time transferred to the Ohio indictment, the speedy trial clock began with a 59-day balance. The Court agrees this is the case.

Chivers' speedy trial clock started running in Kentucky on March 1, 2019—the day after his initial appearance. (*See* EDKY Docket at #175). *See also* 18 U.S.C. § 3161(c)(1). The clock ran for 46 days until April 16, 2019, when Chivers' counsel filed a motion requesting a continuance. (*See* EDKY Docket at #176). The next day, the court granted the continuance and excluded the time between the then-current trial date, April 30, 2019, and the new trial date, June 18, 2019, based on 18 U.S.C. §§ 3161(h)(7)(A) and (B)(i). (*See* Apr. Continuance at #199). April 16th, the day Chivers' attorney made the motion, and April 17th, the day the court decided that motion, are excluded from the speedy trial calculations. *See* 18 U.S.C. § 3161(h)(1)(D). The clock ran again from April 18, 2019, until April 30, 2019. The time from April 30, 2019, through the date the court dismissed the indictment without prejudice—November 5, 2019—was all excluded based on the judge's various ends-of-justice findings, (*see* Aug. Continuance at #208), or the court's time spent considering the

Government's motion to dismiss. (*See* Oct. Continuance at #210). Thus, a total of 59 nonexcludable days elapsed in Kentucky, as the Government suggests.

The relevant question for purposes of the instant Motion, then, is how much time has elapsed since Chivers' initial appearance in the Southern District of Ohio. As a general matter, Chivers' speedy trial clock would have started ticking again the day after his initial appearance in this District. *See* 18 U.S.C. § 3161(c)(1). But, at his initial appearance, Chivers moved the Court to allow him to proceed pro se, which automatically tolled time "from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion." *See id.* at § 3161(h)(1)(D).

Unfortunately, it is not immediately clear how that statutory language applies on the facts here. One could argue that a "prompt disposition" on Chivers' motion occurred at the initial appearance, when the magistrate judge allowed Chivers to proceed without counsel. But, while that is a perhaps a plausible argument, a careful review of the transcript from that hearing convinces the Court that was not in fact the case.

It is settled law that before a court can grant a motion for a defendant to represent him or herself, the court must undertake a *Faretta* hearing. Indeed, the Sixth Circuit recommends a full litany of questions, modeled on 1 *Bench Book for United States District Judges* 1.02-2–5 (3d ed.1986), that the court is to pose at such a hearing. *See United States v. Cromer*, 389 F.3d 662, 680 (6th Cir. 2004). And Sixth Circuit precedent also requires, for example, that a defendant be advised of the maximum potential penalty before electing to proceed pro se. *Akins v. Easterling*, 648

F.3d 380, 399 (6th Cir. 2011) (noting that the defendant must understand the range of allowable punishments before waiving his right to counsel).

Here, a review of the transcript shows that the magistrate judge did not conduct a full *Faretta* hearing at the initial appearance. That is, she did not provide Chivers all of the information needed to ensure that his decision to proceed pro se was knowing and voluntary. Rather, it appears she merely undertook a limited inquiry, designed to ensure that Chivers was competent to represent himself *for purposes of entering a not guilty plea at the arraignment*—a plea that, of course, creates very little prospect of immediate prejudice. Thus, the magistrate judge did not intend to, and in fact did not, at the initial appearance "promptly dispose" of Chivers' motion to represent himself. Rather, that motion remained pending.

The magistrate judge then ordered the case to "proceed to the docket of Judge Barrett for all further proceedings." (Doc. 8; *See also* Tr. of at #418–19, *United States v. Chivers*, No. 1:19-cr-119 (Doc. 36)). One aspect of those "further proceedings," then, involved resolving Chivers' outstanding motion to represent himself in this criminal proceeding. Accordingly, the judge promptly arranged the required *Faretta* hearing to dispose of that motion. Thus, under 18 U.S.C. § 3161(h)(1)(D), the time from Chivers' initial appearance, where he made the motion, November 13, 2019, through the *Faretta* hearing on December 2, 2019, when the judge granted that motion, is excludable.

The time after the *Faretta* hearing is also excludable. At the *Faretta* hearing, in addition to granting Chivers' motion to proceed pro se, the judge and Chivers

discussed when Chivers would be ready for trial. (Doc. 12). The hearing minutes indicate that Chivers "verbally waiv[ed] speedy trial as he requested 60 days to organize the filing of motions and a trial setting as well as explore any resolution." (Doc. 12). While the judge did not say the words "ends of justice" in the Order that he issued in connection with that hearing, it appears that he granted a continuance under 18 U.S.C. § 3161(h)(7). In that regard, the Sixth Circuit has found that the Speedy Trial Act does not require certain "magic words." *United States v. White*, 920 F.3d 1109, 1116 (6th Cir. 2019). Instead, so long as the court's reasons for granting a continuance are clear from the context or the record, and those reasons are permissible under the Act, then the time will still be excluded under § 3161(h)(7). *Id.* The context here is clear—the judge acknowledged that Chivers needed time to prepare his motions and explore other possible resolutions, which are two permissible bases to grant a continuance. Thus, the time between the *Faretta* hearing on December 2, 2019, and Chivers' motions deadline set at that hearing, February 3, 2020, is excluded from the speedy trial clock based on 18 U.S.C. §§ 3161(h)(7)(A) and (B)(i).

Then, on January 27, 2020, Chivers filed six separate pretrial motions, some asserting multiple grounds. These motions also automatically exclude the time that the Court requires to gather all the materials necessary to decide the motions, and then an additional 30 days to issue the actual decisions. *See* 18 U.S.C. §§ 3161(h)(1)(D), (H). Moreover, apart from the automatic exclusions under those statutory provisions, this Court also instituted an ends-of-justice finding on January

31, 2020, which excluded the time between January 27, 2020, and the date on which this Court decides Chivers' motions—a continuance that the Court found was warranted to provide the Court due time to adequately consider the voluminous pro se motions that Chivers had filed.

That brings us to the present. From the Court's calculations above, all the days that have passed in the Southern District of Ohio are excludable under the Speedy Trial Act. Given that 59 days elapsed in the Eastern District of Kentucky, 11 days remain on the 70-day clock.

That, however, is not the end of the story. The Court will not be scheduling this matter for trial in the next 11 days. That is because, under Southern District of Ohio General Order 20-02, entered March 12, 2020, "all civil and criminal matters scheduled for jury trial before any district or magistrate judge in the Southern District of Ohio, including any associated deadlines, are CONTINUED for Thirty (30) Days, pending further Order of the Court." That Order separately makes an ends-of-justice finding that, because of the impact of the current Covid-19 situation on the Court's ability "to obtain an adequate spectrum of jurors," as well as public health concerns of counsel and Court staff, this continuance is excludable time under the Speedy Trial Act.

Thus, the earliest that the Court will be able to schedule Chivers for trial under General Order 20-02 is April 13, 2020. And, given the ends-of-justice finding in that General Order, this Court specifically finds that any time elapsing from the entry of

this Order on Chivers' Motion to Dismiss, up through and including April 13, 2020, is properly excluded from the Speedy Trial clock.

## CONCLUSION

For the reasons discussed above, none of Chivers' four attacks against his indictment were successful. Thus, Chivers' Motion to Dismiss Indictment (Doc. 21) is **DENIED**.

> **SO ORDERED.**

March 23, 2020
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**