**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

**UNITED STATES OF AMERICA,**

    **Plaintiff,**

                             **Case No. 1:19-cr-119**

    **v.**                         **JUDGE DOUGLAS R. COLE**

**DARNELL CHIVERS,**

    **Defendant.**

## OPINION AND ORDER

This case is before the Court on Defendant Darnell Chivers' Motion to Suppress (Doc. 58). The Motion seeks to exclude, on Fourth Amendment grounds, evidence that law enforcement officers obtained during a traffic stop. Of course, the Fourth Amendment does not prohibit all searches and seizures, but rather only unreasonable ones. Although reasonableness frameworks rarely give rise to bright-line rules, the Supreme Court has announced one such rule in connection with traffic stops. In *Rodriguez v. United States*, 575 U.S. 348, 350–51 (2015), the Court held that, absent reasonable suspicion, law enforcement officers cannot undertake investigative activities unrelated to a traffic stop that will prolong that stop. Period. Even a de minimis prolongation triggers the prohibition. Measured against that standard, the Court finds it must **GRANT** Chivers' Motion to Suppress. The officers here initiated investigative activities that prolonged the traffic stop, but are unable to articulate grounds, existing when they started those investigative activities, giving rise to a reasonable suspicion of criminal conduct. And no exception to the exclusionary rule

is available on the facts here that would allow the Government to use the evidence

obtained through that improper search.

## BACKGROUND

### A.    Ohio State Highway Patrol Troopers Franz and Hickey Pulled Chivers Over On Interstate 75 For Speeding.

Just after midnight on May 24, 2017, two Ohio State Highway Patrol (OSHP)

Troopers, Clarke Franz and William Hickey, were on stationary patrol on Interstate

75 north of Cincinnati. (*See* Mot. to Suppress Hr'g Tr. ("Hr'g Tr."), Doc. 68, #720).

Trooper Hickey, who had been with the OSHP for about a year and a half at the time,

was training Trooper Franz—a rookie, who was roughly 40 days into his career as a

trooper. (*See id.* at #718–20). Normally, a trooper must have at least two years of

experience to train another trooper, but because Trooper Franz's cadet class had been

unusually large (thus requiring more trainers), Trooper Hickey received special

permission to become a trainer. (*Id.* at #829).

Around 1:24 a.m., the two Troopers observed a vehicle speeding. (OSHP Rep.

of Investigation, Doc. 64-1, #648; *see also* Hr'g Tr. at #764–65). Trooper Franz visually

observed the car traveling at a speed he estimated to be 82 miles per hour[1] in a 65

mile per hour zone. The Troopers used a LIDAR (radar) system to confirm that the

car was in fact traveling 84 miles per hour. (Hr'g Tr. at #720–22). The Troopers then

pulled out, activated their lights, and initiated a traffic stop. (*Id.* at #722). The entire

stop is captured on video, which automatically began to run shortly after the lights

---

[1] Trooper Franz testified that troopers are trained to estimate the speed of moving vehicles. To pass that part of their training, they are required to show that they can reliably estimate a vehicle's speed within plus or minus two miles per hour. (*See* Hr'g Tr. at #721).

were activated on the Troopers' vehicle. (*See* Mot. to Suppress Hr'g, Gov't's Ex. 1;[2] *see also* Hr'g Tr. at #764–65).

The driver of the target vehicle, who turned out to be Chivers, pulled over on the right shoulder of the highway about two minutes into the video. The Troopers likewise pulled over and parked behind the vehicle. They then exited their patrol car and approached the vehicle's passenger side (thereby allowing them to stay away from the highway traffic while conversing with the vehicle occupants). (*See* Outside Car Camera, Gov't's Ex. 1, 2:00[3]). Trooper Franz took the lead because he was in training, with Trooper Hickey on his flank. As they approached, the Troopers saw that there were three male occupants in the vehicle. Two occupied the front seats, and the remaining person was in the back. Trooper Franz leaned into the passenger side window to speak to the driver. At the time, the Troopers were shining a flashlight into the vehicle across the passenger-side occupant. (*See* Hr'g Tr. at #778).

Trooper Franz explained why he pulled the vehicle over, asked where the occupants were headed, and inquired where the trip originated. (Outside Car Camera at 2:12–2:40). The men told Trooper Franz that they were traveling from Richmond, Indiana, to Cincinnati, Ohio (about a 67-mile trip). Trooper Franz asked the driver for his license and registration, at which time the Troopers learned that the vehicle

---

[2] Government's Exhibit 1 contains two videos capturing two different camera angles: one inside the cruiser directed toward the vehicle's interior (identified as "Inside Car Camera") and another mounted on the dashboard and pointed forward (identified as "Outside Car Camera"). The Inside Car Camera always captured the audio because of a microphone stationed inside the Troopers' cruiser. The Outside Car Camera, however, captured audio only from Trooper Franz's belt microphone; thus, that video contains audio only when Trooper Franz is outside the cruiser and, even then, only when Trooper Franz is present.

[3] Citations to the timestamps in the videos are approximate.

was a rental. (*Id.* at 2:40–2:42). A few seconds later, Trooper Franz also asked the other men for identification. (*Id.* at 2:53–3:53; *see also* Hr'g Tr. at #776). All three men complied, although the passenger in the back did not have a driver's license, but rather provided his social security number and date of birth. After collecting this information, the Troopers returned to their cruiser. (Outside Car Camera at 3:55).

**B.     Inside The Cruiser, Trooper Franz Ran The Three Men's Information Through The Police Databases And The Troopers Discussed The Front-Seat Passenger's Nervousness.**

Upon re-entering their cruiser, the Troopers ran the occupants' information through the computer and discussed the stop so far. (*See* Inside Car Camera, Gov't's Ex. 1, 4:07–6:39). The Troopers identified the vehicle occupants as Darnell Chivers (the driver), Tyrone Denny (the front-seat passenger), and Phillip Lee (the back-seat passenger). While Trooper Franz ran the information, the pair remarked how Chivers was driving a rental car, (*see* Hr'g Tr. at #772–73), and talked about where the passengers said they were coming from and where they were headed. (Inside Car Camera at 4:30–4:43).

Trooper Franz pointed out that the front-seat passenger (Denny) was "frozen like a mannequin." (*See id.* at 4:57–4:58). He described it at the hearing as a "rigid, locked-on appearance," and a "heightened sense of nervousness." (Hr'g Tr. at #731, 735). Trooper Franz considered this to be a "large criminal indicator of possible criminal activity." (*Id.* at #776–77). Denny's behavior also stood out to Trooper Hickey because "it's not the typical way that somebody acts on a traffic stop if nothing criminal is going on." (*Id.* at #823). While both Troopers made similar comments on

4

Denny's behavior, there was some disagreement in their testimony at the suppression hearing regarding the other occupants' behavior. Trooper Hickey testified that all three occupants appeared nervous, (*id.* at #822, 830–32), but Trooper Franz remembered that only Denny was nervous, (*id.* at #780).

In any event, a few minutes after the Troopers ran the occupants' information through their system, the reports started coming back. (*See* Inside Car Camera at 5:28–6:39). The reports showed that Chivers had a valid driver's license and that there were no open warrants for anyone in the vehicle. (Hr'g Tr. at #784).

## C. Instead Of Wrapping Up The Traffic Stop, The Troopers Started Questioning The Men Further.

While Trooper Franz "was still running [the vehicle occupants'] information," (*id.* at #785), Trooper Hickey decided to pull Chivers out of the vehicle and question him further. (*See* Inside Car Camera at 6:39). Hickey concedes this was unrelated to the Troopers' investigation of the speeding incident. (Hr'g Tr. at #838–39 (testifying that this questioning had no purpose "as far as the speeding ticket stop" was concerned)). Trooper Franz likewise testified that, as far as Franz could tell, Trooper Hickey undertook this questioning with the intent to pursue a criminal investigation into other potential crimes. (*Id.* at #786 (testifying that he did not see any justification at that point in the stop to remove Chivers and frisk him, and that this was unrelated to issuing a speeding ticket)).

Trooper Hickey first removed Chivers from his vehicle and frisked him.[4] (Outside Car Camera at 7:01–7:33). He found nothing on Chivers during the frisk. Although the recordings do not include audio of this encounter, from Chivers' arm gestures, he appeared to be frustrated.

Meanwhile, Trooper Franz had completed running the men's information. His next step typically would have been to begin writing the ticket itself. (Hr'g Tr. at #768–69). Instead, Trooper Franz decided to discontinue his ticket-writing activities and exit the cruiser. (*See* Outside Car Camera at 8:22–8:37; *see also* Hr'g Tr. at #786).

He first stopped where Trooper Hickey was questioning Chivers, and listened in on the exchange. Trooper Hickey told Chivers that his passengers were "kinda [sic] giving us that vibe." (Outside Car Camera at 8:43–8:45). He inquired whether "something [was] going on here." (*Id.* at 8:49). In response, Chivers explained that he needed a rental car because he had taken his Cadillac Escalade to the shop after his "transmission went out." (*Id.* at 8:51–9:03). At some point in this conversation, although it is not captured on audio, Chivers tells the Troopers that he was headed to Cincinnati to visit family. (*See* Hr'g Tr. at #733, 788, 824).

---

[4] From approximately 6:40 to 8:30 in the Outside Car Camera video, there is no audio recording of Trooper Hickey speaking with Chivers. That is because Trooper Franz is wearing the microphone on his belt, and Trooper Franz remained in the cruiser for this portion of the exchange.

6

While Trooper Hickey continued to question Chivers, Trooper Franz moved on to question the passengers in the car.[5] (Outside Car Camera at 9:30–9:34). Trooper Franz testified that this questioning was not related to the speeding citation:

> Q: So while Trooper Hickey is outside talking to Mr. Chivers, you're still in the patrol car for a period of time, correct?
>
> A: Yes, sir.
>
> Q: And then you get out. What was your purpose in getting out of the car?
>
> A: To speak to the occupants and further inquire about where they're headed to [sic] and what they're doing.
>
> Q: So that's not related to issuing a speeding ticket, correct?
>
> A: Correct.
>
> Q: This is related to what?
>
> A: A criminal investigation.

(Hr'g Tr. at #786).

After approaching the vehicle, Trooper Franz again questioned the passengers, Denny and Lee, about their travel plans. Trooper Franz asked the passengers why they were headed down to Cincinnati. (Outside Car Camera at 9:45–9:50). The passengers told him they were "going to the clubs." (*Id.* at 9:54–9:55). Trooper Franz asked them which club, (*see id.* at 9:56–9:57), but they said they did not know. (Hr'g Tr. at #791, 793). Already having heard Chivers say that he was going to Cincinnati to visit family, Trooper Franz confronted Denny and Lee about these "conflicting"

---

[5] Around 9:34 in the Outside Car Camera video, the audio no longer captured Trooper Hickey's conversation with Chivers because Trooper Franz, wearing the belt microphone, moved on to talk to the passengers.

stories. (Outside Car Camera at 10:06–10:36). The audio does not capture the passengers' responses. After this brief exchange, Chivers returned to his vehicle and the Troopers got back in their cruiser. (*See id.* at 10:38).

## D.     The Troopers Discussed The Information They Learned And Decided To Call A Drug Dog.

Upon re-entering their cruiser, rather than focus on completing the activities relating to the traffic ticket, the Troopers discussed the potential conflicts between the stories they had just received from Chivers and his passengers. (*See* Inside Car Camera at 10:51–11:15). Trooper Hickey said that Chivers originally told Hickey that Chivers was going to visit family, but then changed his story to say that he was going to the clubs. Trooper Hickey told Trooper Franz that Hickey did not believe it made sense that Chivers would be visiting family at 1:30 in the morning, because "people visit family … during the day." (*Id.* at 11:10–11:13).

About ten seconds later, at 11:24 in the video, the Troopers started discussing whether to call a drug dog. Trooper Hickey asked Trooper Franz if he wanted to check on one. (*Id.* at 11:36). Trooper Franz said he "was just gettin' [sic] that vibe" from the passengers. (*Id.* at 11:41). The Troopers also discussed how they could not see a reason for the passengers to be nervous. (*Id.* at 11:42–11:50).

At this point, Trooper Hickey informed Trooper Franz that Franz had failed to run Chivers' information through a particular Ohio database, and Trooper Franz then initiated that search. (*See id.* at 11:50–12:36). This particular check showed that Chivers was not from Ohio. (*See id.* at 12:37–12:42). Trooper Hickey then told Trooper Franz to check if a drug dog was available. (*See id.* at 12:44–13:00).

8

While waiting to hear about the drug dog, Trooper Franz went back to writing Chivers' traffic ticket, and the Troopers continued discussing the stop. While Trooper Franz was writing the ticket, (*see id.* at 13:00–13:03), Trooper Hickey noted that the travelers' stories presented a "weird scenario," and he did not understand why everyone was so nervous. He also noted he thought Chivers was trying to use his cellphone to record the Troopers. (*Id.* at 13:05–13:30). The Troopers then revisited Chivers' explanation for the rental car and commented how they wanted to check the date on which the car was rented. (*Id.* at 13:30–13:32). Around the 13:32 mark in the video, Trooper Hickey began looking at the rental agreement paperwork. Although not entirely clear from the video and the subsequent testimony, it appears this is the first time the Troopers took a hard look at that paperwork. Trooper Hickey then, also for the first time, pointed out that the car was rented to a Diana Coleman, not Darnell Chivers. (*Id.* at 13:51–13:59).

About a minute later, the dispatcher reported that there was no dog available, but that he would check with other counties. (*Id.* at 14:37–14:43). After talking about how it would take a while for a dog from another county to arrive on scene, the Troopers told the dispatcher to hold off on the dog. (*Id.* at 14:43–14:52). While they discussed this, Trooper Hickey continued flipping through the rental agreement paperwork. (*Id.* at 14:45–15:04). Around the 15:10 mark, the Troopers again noted that the rental paperwork showed the car was rented to Diana Coleman, who was not present in the vehicle.

9

Another minute later, the dispatcher returned and told the officers that he did indeed find a dog nearby, but it would take some time for the dog to arrive on scene. (*Id.* at 15:53–16:01). The Troopers discussed their options. Trooper Franz asked Trooper Hickey, "I mean, can you justify the length of the stop is the question." (*Id.* at 16:11–16:13). Trooper Franz thought the three men were acting weird enough and not making sense. Trooper Hickey agreed. Trooper Franz told the dispatcher to send the dog. (*Id.* at 16:25).

The Troopers remained in their cruiser for approximately eight more minutes after calling for the drug dog. During this time, the Troopers were "prolonging the stop to wait for the drug dog." (Hr'g Tr. at #803, 811). The Troopers discussed the rental car situation. Trooper Franz remarked how it did not make sense that someone else would rent the car for Chivers when his Escalade stopped working. (Inside Car Camera at 17:18–17:26). Trooper Hickey said he planned to ask Chivers why Diana Coleman was not in the vehicle. (*Id.* at 23:47–23:59). They then discussed how they planned to handle the rest of the stop. Trooper Hickey told Trooper Franz that they would pull Chivers out of the vehicle and secure him in the back of their cruiser. At that point, they could ask Chivers about Coleman. (*Id.* at 23:20–24:01). Trooper Franz claimed they did this not only to delay for the drug dog, but also to investigate the issue with the rental agreement. (Hr'g Tr. at #812).

## E. The Troopers Confronted Chivers Over Issues With The Rental Agreement.

The Troopers then exited their cruiser and began removing the men from Chivers' car, in preparation for the drug dog's arrival. The Troopers started with

Chivers. (*See* Outside Car Camera at 24:10–24:43). Once Chivers was out of his vehicle, the Troopers began questioning him about the rental agreement. (*Id.* at 24:44). The Troopers pointed out that the rental agreement listed Diana Coleman, not Darnell Chivers, as being authorized to operate the vehicle. Chivers explained that Diana Coleman was his girlfriend, and although she rented the car, he was an authorized driver. Trooper Hickey said he did not see Chivers' name on the rental agreement. But Chivers was adamant that his name was on the paperwork. (*See id.* at 24:44–25:12).

After asking Chivers initial questions about the rental agreement, the Troopers frisked Chivers again and moved him to the side of their cruiser. (*Id.* at 25:14–25:31). The Troopers wanted to move him by the cruiser so they could discuss the rental agreement with him. (*See id.* at 25:34–25:40).[6] Trooper Hickey said he would look at the agreement again, but he did not see Chivers' name on it. (*Id.* at 25:41). While they moved Chivers to the cruiser, the Troopers told him he was not under arrest, but they were investigating why Chivers' name was not on the rental agreement. (*Id.* at 25:53–26:02). Chivers appeared frustrated, and asked why they were putting him in the cruiser when he had a valid license and insurance. (Inside Car Camera at 26:15–26:22). The Troopers reiterated they were trying to figure out "what's going on with the car" because Chivers' name was not on the rental agreement. (*Id.* at 26:24–26:32).

---

[6] Because of their position next to the cruiser, the video camera does not capture much of the next exchange.

Chivers finally complied and sat in the back seat of the cruiser while the Troopers continued questioning him about the rental agreement. Starting at about the 27:53-minute mark, the Troopers appeared to have the physical agreement in their hand. They then showed Chivers the agreement. (*Id.* at 27:57). The Troopers and Chivers went back-and-forth—the Troopers claimed Chivers' name was not on the rental agreement as an authorized driver, but Chivers kept insisting that it was. The Troopers actually handed Chivers back the rental agreement (for the first time since they took it at the beginning of the stop) around the 28:24-minute mark.[7]

## F. The Canine Conducted The Sniff And Alerted On Chivers' Vehicle, Which The Troopers Subsequently Searched And Found A Gun.

About ten seconds later (*id.* at 28:33–28:43), while Chivers was examining the rental agreement, the drug dog, Felix, and his handler, Officer Michael Doughman, arrived on the scene. The Troopers announced they were going to have the canine perform a free air sniff of Chivers' vehicle. (*Id.* at 28:43–28:49). They then removed Denny and Lee from the vehicle and placed them in the back seat of the cruiser with Chivers. (*See* Outside Car Camera at 28:55–31:13).

Felix and Officer Doughman then approached Chivers' vehicle from the rear-passenger side. When Denny had exited through the front-passenger door, he left it ajar. Because of that, Felix was able to sniff the inside of the car briefly before being

---

[7] At the hearing, the Government did not produce the rental agreement from the stop. Chivers had obtained what he claimed was a replacement copy of the rental agreement from the car rental company. The rental agreement that he provided at the hearing confirmed that he was listed as an authorized driver on the rental agreement. The Government does not dispute that fact, although the Government also does not admit (or deny) that he was listed on the copy of the agreement presented to the officers that evening. (*See* U.S. Post-Hr'g Resp. in Opp'n to Mot. to Suppress Evid. from the Traffic Stop, Doc. 71, #931 n.2).

pulled away by his handler. (*Id.* at 31:33–31:38). Officer Doughman reset Felix (the free air sniff is supposed to be outside the vehicle) and took him around to the front of the car to start the sniff. (*See id.* at 31:39–31:50). During the sniff, Felix alerted at least twice: once on the driver-side back door and again on the passenger-side front door. (*Id.* at 32:05–32:10, 32:23–32:26).

Officer Doughman and Trooper Franz then searched Chivers' vehicle for drugs. (*See id.* at 34:18–43:45). They did not find any drugs, but they did find a firearm located inside a shoe in the backseat of Chivers' car. (*See* OSHP Rep. of Investigation at #655). The Troopers questioned Chivers, Denny, and Lee about who owned the gun. Based on the evidence they uncovered on the scene after questioning the men, the Troopers decided to arrest Chivers for possessing the gun.

## G. Summary Of Events.

To summarize, then, the main events that occurred during the stop proceeded according to the following chronology:

- **Outside Car Camera 2:00** – Chivers' vehicle pulled over.

- **Outside Car Camera 2:40–3:55** – Troopers collected the men's identification and obtained the rental agreement. The Troopers also inquired about where the men had come from and where they were headed.

- **Inside Car Camera 4:30–6:39** – Troopers ran the men's information through their databases and discussed Denny's nervousness.

- **Outside Car Camera 6:39–8:37** – Trooper Hickey pulled Chivers out of his car to frisk and question him, while Trooper Franz finished running the men's information. Both Trooper Hickey and Franz testified that Hickey's questioning was unrelated to the speeding ticket. (*See* Hr'g Tr. at #786, 838–39).

- **Outside Car Camera 8:37** – Trooper Franz stopped his activities related to the completing the speeding ticket, and instead joined Trooper Hickey to begin

13

questioning the passengers for reasons unrelated to the traffic stop. At this point both Troopers had deviated from the original purpose of the stop.

- **Outside Car Camera 8:43–9:30** – Chivers explained to Trooper Hickey (with Trooper Franz present) that he needed a rental car because his truck broke down, and that he was on his way to Cincinnati to visit family.

- **Outside Car Camera 9:34–10:36** – Trooper Franz left Trooper Hickey and went to the vehicle to question Denny and Lee about their travel plans for a second time. At the hearing, Trooper Franz conceded that this questioning was unrelated to his activities in connection with the traffic stop. (Hr'g Tr. at #786). Denny and Lee told Trooper Franz they were headed to the clubs in Cincinnati, which Trooper Franz thought conflicted with Chivers' story of visiting family.

- **Inside Car Camera 10:51–13:03** – After returning to their cruiser, the Troopers discussed the "conflicting" stories they received and again discussed Denny's nervousness, and decided to check if a drug dog was available.

- **Inside Car Camera 13:00–13:03** – Trooper Franz began writing Chivers' traffic citation.

- **Inside Car Camera 13:30–13:32** – Troopers appeared to take the first detailed look at Chivers' rental agreement.

- **Inside Car Camera 13:51–13:59** – Troopers noted for the first time that Diana Coleman actually rented the vehicle, but she was not present in the car.

- **Inside Car Camera 15:53–16:25** – Dispatch reported they found a drug dog, and the Troopers decided to have the dog come out to the scene.

- **Inside Car Camera 16:25–24:10** – Troopers remained in their cruiser waiting for the drug dog. They continued to discuss the situation and planned how they would execute the rest of the stop.

- **Outside Car Camera 24:10–26:32** – Troopers removed Chivers from his vehicle, frisked him again, and questioned him about the rental agreement.

- **Outside Car Camera 27:00–28:24** – Troopers continued questioning Chivers about the rental agreement, pulling out the agreement to show it to Chivers.

- **Outside Car Camera 28:24–28:43** – Troopers handed Chivers the rental agreement, which was the first time Chivers himself had been able to look at the agreement since the Troopers took it from him at the beginning of the stop.

- **Outside Car Camera 28:43–32:26** – Troopers announced that the canine arrived to conduct an open-air sniff of the vehicle and then pulled Denny and

Lee out of Chivers' car and placed them in their cruiser. The dog conducted the sniff. The dog alerted to the driver-side back door and the passenger-side front door.

- **Outside Car Camera 34:18–43:45** – Troopers searched Chivers' vehicle and found a gun in the back seat.

## PROCEDURAL HISTORY

On October 2, 2019, a federal Grand Jury in this District returned a one-count Indictment, charging Chivers with possession of a firearm by a prohibited person—a violation of 18 U.S.C. §§ 922(g)(1) and 2. (Indictment, Doc. 3, #14). Chivers filed the pending Motion to Suppress on July 17, 2020. (*See* Doc. 58). The Court held an evidentiary hearing on the Motion on August 6, 2020. (*See* Aug. 6, 2020 Min. Entry). Trooper Franz, Trooper Hickey, and Officer Doughman all testified at that hearing. There were no other witnesses, although Chivers did introduce a copy of the rental agreement. The parties have since filed post-hearing briefs, and the Motion is now ripe for review.

## LAW AND ANALYSIS

**A.  The Troopers Violated Chivers' Fourth Amendment Rights When They Prolonged The Traffic Stop To Investigate Unrelated Matters Without A Reasonably Articulable Suspicion.**

Stopping and detaining a motorist constitutes a seizure under the Fourth Amendment. *United States v. Bell*, 555 F.3d 535, 539 (6th Cir. 2009). To comport with the Fourth Amendment's prohibition against unreasonable seizures, police officers must have "reasonable suspicion" to pull someone over for a traffic violation. *Heien v. North Carolina*, 574 U.S. 54, 60 (2014). That is, officers must have a "particularized and objective basis for suspecting the particular person stopped of breaking the law."

*Id.* (quotation omitted). In Chivers' post-hearing briefing, he concedes the Troopers had this initial reasonable suspicion when they first pulled him over for speeding. (*See* Def.'s Post-Hr'g Brief in Supp. of Mot. to Suppress, Doc. 70, #910 ("Mr. Chivers concedes that the government introduced sufficient evidence to establish that Mr. Chivers' vehicle was exceeding the speed limit.")).

But that is not the end of the story. Even if officers have a reasonable basis for initiating a traffic stop, they do not have unfettered authority to detain a person indefinitely. *United States v. Campbell*, 970 F.3d 1342, 1351–52 (11th Cir. 2020). Instead, traffic stops "must be limited in both scope and duration." *United States v. Lott*, 954 F.3d 919, 923 (6th Cir. 2020) (alteration omitted) (quoting *United States v. Everett*, 601 F.3d 484, 488 (6th Cir. 2010)). Because a routine traffic stop should be a "relatively brief encounter," such a stop is more like a *Terry* stop than a formal arrest. *Knowles v. Iowa*, 525 U.S. 113, 117 (1998); *see also generally Terry v. Ohio* 392 U.S. 1 (1968). Similar to a *Terry* stop, the tolerable duration of police inquiries in this context is determined by the seizure's "mission," i.e., "to address the traffic violation that warranted the stop" and "attend to related safety concerns[.]" *Rodriguez v. United States*, 575 U.S. 348, 354 (2015).

A traffic stop may "last no longer than is necessary" to complete this mission. *Id.* The mission is complete, and the officer's authority to detain a person ceases, "when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.* The Supreme Court has identified a number of tasks it says are "ordinary inquiries incident to [the traffic] stop." *Id.* at 355. These inquiries include

16

"checking the driver's license, determining whether there are any outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* Questions on these topics are appropriate to ensure "that vehicles on the road are operated safely and responsibly." *Id.* Such questions do not *prolong* the stop, as they are instead *part of* the stop.

But the Supreme Court has also identified tasks that are not related to a stop's purpose. For example, in *Arizona v. Johnson*, 555 U.S. 323, 332 (2009), the Court said that questioning unrelated to the traffic stop—there, for example, questions directed at a passenger's gang affiliation—is not related to the stop's purpose. Similarly, using a dog to search for contraband is not related to the stop's purpose. *Rodriguez*, 575 U.S. at 355–56. A dog sniff lacks "the same close connection to roadway safety as the ordinary inquiries" and cannot be "fairly characterized as part of the officer's traffic mission." *Id.* at 356. Instead, a dog sniff is "aimed at detecting evidence of ordinary criminal wrongdoing." *Id.* at 355 (alteration and citation omitted). Related tasks are therefore "ordinary inquiries incident to a traffic stop," whereas unrelated tasks are "other measures aimed at detecting criminal activity more generally." *United States v. Green*, 897 F.3d 173, 179 (3d Cir. 2018) (interpreting *Rodriguez*).

That is not to say that officers necessarily violate the Fourth Amendment every time they question passengers on non-traffic-stop-related topics or use a drug dog during a traffic stop. To the contrary, the Supreme Court also has specifically noted that inquiries and activities unrelated to the traffic stop are lawful, so long as they do not prolong the stop. *Rodriguez*, 575 U.S. at 355 ("An officer ... may conduct certain

17

unrelated checks during an otherwise lawful traffic stop. But ... he may not do so in a way that prolongs the stop, absent … reasonable suspicion[.]"). As the Supreme Court pronounced in *Rodriguez*, the "critical question" is whether such an inquiry "prolongs—*i.e.*, adds time to—the stop[.]" 575 U.S. at 357 (quotations omitted).

Importantly, though, "prolonging" includes any extension of time, no matter how small. While at one time there may have been a de minimis exception—where prolonging a stop was unlawful only if the stop was prolonged unreasonably, *see United States v. Everett*, 601 F.3d 484, 492 (6th Cir. 2010)—that is no longer the case. *Rodriguez* makes clear that this is a bright-line rule. 575 U.S. at 357 (rejecting the government's argument that it is permissible to "incrementally prolong a stop," so long as "the overall duration of the stop remains reasonable in relation to the duration of other traffic stops") (alteration and quotation omitted); *see also Hernandez v. Boles*, 949 F.3d 251, 256 (6th Cir. 2020) (noting that *Rodriguez* rejected the argument that a de minimis extension is permissible, and referring to this as a "bright-line rule"). As the Eleventh Circuit explained in *Campbell*, 970 F.3d at 1352, it does not matter whether a stop is prolonged by eight minutes, or twenty-five seconds. Duration is not the relevant issue—rather an officer must have a reasonable suspicion to suspend processing the traffic violation and engage in activities that prolong the stop *at all*.

Moreover, that is true whether the prolonging investigative activities occur before or after the officers complete the activities related to the stop. *Rodriguez*, 575 U.S. at 357 ("The critical question, then, is not whether the dog sniff occurs before or after the officer issues a ticket, … but whether conducting the sniff 'prolongs'—i.e.,

18

adds time to—'the stop' …."). Imagine, for example, that the tasks associated with a particular traffic stop would have taken an officer six minutes to complete, but that at minute four, he or she diverts to other unrelated investigative activities for a minute. The end result is that this diversion impermissibly prolongs the overall stop, just as if the officer had first completed the traffic stop activities and then undertaken the additional minute of investigation.

To be sure, reasonable suspicion may arise as a result of information learned during the course of the stop. And "if something happen[s] *during the stop* to cause the officer to have a reasonable and articulable suspicion that criminal activity is afoot," then the officers are able to prolong the stop to dispel that suspicion. *United States v. Howard*, 815 F. App'x 69, 76 (6th Cir. 2020) (emphasis in original) (internal quotation omitted) (citing *Lott*, 954 F.3d at 923). But whatever the officer points to as justifying reasonable suspicion necessarily must occur *before* the officer undertakes the activity that prolongs the stop, as it is the officer's reasonable suspicion at the time he or she prolongs the stop that matters.

Combining these various propositions, the resulting standard amounts to this: "a stop is unlawfully prolonged when an officer, without reasonable suspicion, diverts from the stop's purpose and adds time to the stop in order to investigate other crimes." *Campbell*, 970 F.3d at 1355 (citing *Rodriguez*, 575 U.S. at 353–58). In other words, officers violate the Fourth Amendment if they (1) conduct an inquiry that is unrelated to the traffic stop, but instead is aimed at investigating other crimes, (2) that prolongs the stop, (3) without reasonable suspicion. *Id.* Chivers identifies several instances

where the Troopers here allegedly engaged in unrelated inquiries that prolonged the traffic stop without reasonable suspicion. But because the Court finds one of those instances to be dispositive on the current motion, the Court starts and ends its analysis there.

> **1.  About Eight Minutes Into The Stop, The Troopers Prolong The Stop By Ceasing To Pursue The Traffic Violation And Instead Launching An Unrelated Criminal Investigation.**

Chivers argues the Troopers unlawfully prolonged the traffic stop starting at about the eight-minute mark, when they began questioning him and his passengers for a second time about where they came from and where they were headed. On that front, by the Troopers' own admissions, these questions involved an unrelated inquiry aimed at investigating other crimes, and the questioning added time to the stop. Thus, as more fully described below, this questioning satisfies the first two of the necessary three elements for establishing a Fourth Amendment violation.

The segment of the video at issue begins with Trooper Franz running Chivers' and the passengers' information through their police databases. (*See* Inside Car Camera at 4:07–6:39). There is no doubt that performing these checks is within the scope of the initial traffic stop. *See Rodriguez*, 575 U.S. at 355 (finding ordinary inquiries incident to the traffic stop to include "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance"). Therefore, the time it took for the Troopers to run the information through their databases did not unlawfully prolong the traffic stop.

Next, Trooper Hickey exits the cruiser to begin re-questioning Chivers, while Trooper Franz continues traffic-stop-related activities. Trooper Hickey's initial questioning of Chivers at this time still comports with the Fourth Amendment. That is because, even though Trooper Hickey himself admitted that his questioning was unrelated to the traffic stop, (*see* Hr'g Tr. at #838–39), the questioning did not *prolong* the stop. Because Trooper Franz was still diligently pursuing stop-related activities, to use the Sixth Circuit's language, Trooper Hickey "was free to question [Chivers] to his heart's content during this time … because the questioning did not prolong the stop[.]" *Howard*, 815 F. App'x at 76 (quotation and citation omitted). And that is true even though Trooper Franz likewise admitted on the stand that he could see no justification at that point in the stop for Trooper Hickey to remove Chivers from his car and frisk him. (Hr'g Tr. at #785). Unless the conduct prolongs a stop, there is no Fourth Amendment violation under *Rodriguez*.

That changed, however, when Trooper Franz finished running his required checks. Trooper Franz testified that, normally at this point in the stop, he would have proceeded to write and issue to the driver a speeding ticket. (*Id.* at #768–69). He had (or at least thought he had) all of the information necessary to issue the citation. But instead of doing so, he "divert[ed] from the stop's purpose." *See Campbell*, 970 F.3d at 1355. That is, he put the ticketing activities aside, and instead chose to question the vehicle's occupants a second time. (*See* Hr'g Tr. at #786). On the stand, Trooper Franz conceded that this additional questioning was "not related to issuing a speeding ticket," and instead was designed to start a "criminal investigation." (*Id.*).

21

At that point, by the Troopers' own admissions, both Troopers had detoured from their traffic-stop activities to launch a criminal investigation. As that brought stop-related activities to a halt, their conduct undeniably prolonged the stop. The sole remaining question then is whether the Troopers had a reasonable suspicion of criminal activity at the time the diversion occurred. *See Rodriguez*, 575 U.S. at 358. That is the inquiry to which the Court turns now.

## 2. The Troopers Did Not Have Reasonable Suspicion To Justify Prolonging The Stop To Investigate Unrelated Potential Criminal Activity.

To establish reasonable suspicion, an officer must demonstrate that he or she has "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417–18 (1981); *see also Terry v. Ohio*, 392 U.S. 1, 21–22 (1986). Although reasonable suspicion is a lower threshold than probable cause, an officer still must act on more than an "inchoate and unparticularized suspicion or 'hunch,'" but instead must have "specific reasonable inferences which [the officer] is entitled to draw from the facts in light of his experience." *Terry*, 392 U.S. at 27. The reasonable suspicion inquiry "falls considerably short of 51% accuracy," because "[t]o be reasonable is not to be perfect." *Kansas v. Glover*, 140 S. Ct. 1183, 1188 (2020) (quotation and citation omitted). Instead, reasonable suspicion involves officers making "commonsense judgments and inferences about human behavior." *Id.* (quoting *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000)). The standard for reasonable suspicion takes into account the totality of the circumstances—the whole picture. *Id.* at 1191. Although one individual fact that

forms the basis of an officer's suspicion may be "perhaps innocent in itself," reasonable suspicion nevertheless exists when all the circumstances "taken together warrant[] further investigation." *Terry*, 392 U.S. at 22.

When Trooper Franz exited the cruiser and switched gears into a criminal investigation, thereby prolonging the stop, he was aware of the following facts: (1) it was 1:30 a.m. and the men were traveling down I-75 from Richmond, Indiana, to Cincinnati, Ohio, which the Troopers described as large drug corridor; (2) the front-seat passenger appeared abnormally nervous; and (3) the car was a rental. (*See* Hr'g Tr. at #786). The Court finds that, considered separately or together, these factors do not create reasonable suspicion of criminal activity.

*Traveling At 1:30 A.M. Down A "Common Drug Corridor."* Trooper Franz testified that the men traveling from Richmond, Indiana, to Cincinnati, Ohio, at 1:30 in the morning made him suspicious. (*Id.* at #781). He felt particularly concerned because Interstate 75 is "one of the largest drug corridors in the country." (*Id.* at #782). To him, it "seem[ed] odd" that three men would be traveling from Indiana to Cincinnati at that time of day. (*See id.* at #783–84). Trooper Hickey agreed that not only does drug trafficking frequently occur on I-75, but also criminal activity in general. (*Id.* at #840).

But neither the time of day, nor traveling down I-75, adds much to the reasonable suspicion analysis. The Sixth Circuit has "never suggested that late-night travel is inherently suspicious." *United States v. Townsend*, 305 F.3d 537, 543 (6th Cir. 2002). Trooper Franz acknowledged at the hearing that people commonly travel

at all hours of the day for various reasons, and that the stretch of I-75 between Cincinnati and Dayton (where the stop occurred) is a frequently traveled corridor. (Hr'g Tr. at #782–83). Likewise, "travel between population centers is a relativ[ely] weak indicator of illegal activity." *See United States v. Urrieta*, 520 F.3d 569, 576 (6th Cir. 2008). That is because "there is almost no city in the country that could not be characterized as either a major narcotics distribution center or a city through which drug couriers pass on their way to a major narcotics distribution center." *Id.* (quotation and alteration omitted). As a result, the fact that the men were traveling late at night on a busy freeway does not weigh heavily in the reasonable suspicion analysis, notwithstanding the Trooper's characterization of that highway as a "drug corridor."

*The Men's Nervousness.* Both Troopers stressed that the front-seat passenger—Denny—appeared abnormally nervous. Trooper Franz described Denny as having a "locked-on appearance," acting "as if his body was rigid[.]" (Hr'g Tr. at #724). He later described it as a "locked-on straight appearance as if there was a ghost 200 feet down the road that he's staring at." (*Id.* at #778). For his part, Trooper Hickey described Denny as looking "almost frozen." (*Id.* at #822). And Trooper Franz found it "very unusual for a passenger to display that level of nervousness" especially because, as a passenger, you have "no skin in the game[.]" (*Id.* at #725).

Reliance on that factor to prolong the stop, however, has both legal and factual problems. Starting with the former, the Sixth Circuit has deemed nervousness "an unreliable indicator, especially in the context of a traffic stop." *United States v. Stepp*,

680 F.3d 651, 665 (6th Cir. 2012) (citation omitted). That is because citizens often become nervous when stopped by police "even when they have nothing to hide." *United States v. Richardson*, 385 F.3d 625, 631 (6th Cir. 2004). Because of its unreliability, nervousness is entitled to little weight. And even then, only "in conjunction with other factors." *United States v. Winters*, 782 F.3d 289, 299 (6th Cir. 2015) (quotation omitted). The Government acknowledges that. (*See* U.S. Post-Hr'g Resp. in Opp'n to Mot. to Suppress Evid. from the Traffic Stop ("U.S. Post-Hr'g Br."), Doc. 71, #936). Thus, as a matter of law, "nervousness," in and of itself, provides little support for the Troopers' decision to prolong the stop.

Likewise, the fact that Denny seemed disinclined to engage with the Troopers during the stop adds little to the reasonable suspicion calculus. As the Supreme Court observed in *Florida v. Royer*, 460 U.S. 491, 498 (1983), even in those situations when officers are free to ask questions, a citizen's "refusal to listen or answer does not, without more," provide "reasonable, objective grounds" to suspect criminal activity. "The person approached … need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his own way." *Id.* at 497–98. That is particularly true as to Denny, who was a passenger in the vehicle, not the driver. As a general matter, soliciting information from a passenger is not as centrally tied to the traffic-stop's mission, which (at least here) turned on the driver's conduct (i.e., speeding). *See generally United States v. Landeros*, 913 F.3d 862, 868–70 (9th Cir. 2019) (holding that demanding a passenger's identification is not part of an officer's mission during a traffic stop).

25

As a passenger in a stopped vehicle, of course, Denny did not have the ability to "go on his way." *Royer*, 460 U.S. at 498. But, especially given that he was not free to leave, his decision to "not answer any question put to him" should not count for reasonable suspicion purposes. *Id*; *see also Wardlow*, 528 U.S. at 125 ("[R]efus[ing] to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure."). Any other rule would create something of a Catch-22—if a citizen engages with police, the police can use the information the citizen conveys as a basis for justifying a search, but conversely, at least under the Government's proposed approach, if the citizen declines to engage, that supports further investigation, as well. The Fourth Amendment should not countenance that sort of heads-I-win-tails-you-lose approach to Government searches.

Denny's alleged refusal to make eye contact perhaps stands on somewhat different ground in terms of the reasonable suspicion analysis. According to the Fourth Circuit, "while the failure of a suspect to make eye contact, standing alone, is an ambiguous indicator [of criminal activity], the evidence may still contribute to a finding of reasonable suspicion." *United States v. Foster*, 824 F.3d 84, 93 (4th Cir. 2016). But the court immediately qualified that statement, saying it was "hesitant … to afford lack of eye contact much weight because it is no more likely to be an indicator of suspiciousness than a show of respect and an attempt to avoid confrontation." *Id*. (quotation omitted).

The facts of this case illustrate the wisdom of that qualifying observation, and highlight the problems that the "nervousness" justification (and its accompanying

refusal to answer or make eye contact) faces here. The principal evidence of nervousness that the Troopers cited was that the front-seat passenger, Denny, did not turn and look at the Troopers. But that evidence must be understood in factual context. The Troopers were a few inches from the side of Denny's head, and were shining a bright flashlight into the car at 1:30 a.m., across Denny and directed at Chivers. Turning to face the Troopers may well have caused Denny to look almost directly at that light, or at the very least he may have had concerns on that front. And Denny's disinclination to verbally engage with the Troopers may have arisen from an alternate source. Denny, like Chivers, is Black; he may have been nervous at the prospect of being pulled over in the middle of the night, and may have concluded, rightly or wrongly, that participating in the exchange between the Troopers and Chivers could escalate matters, rather than making things better. *See, e.g., United States v. Kelly*, No. 3:20-cr-00016, 2020 WL 4915434, at *8 n.8 (S.D. Iowa Aug. 20, 2020) (citing recent empirical work suggesting that "Black people are more distrustful and nervous (even scared) when interacting with a police officer"). Relatedly, like the court observed in *Foster*, and Chivers' counsel suggested at the hearing on this Motion, *(see* Hr'g Tr. at #779), such conduct could simply reflect an effort to "show … respect" and "avoid confrontation." *See* 824 F.3d at 93. In sum, the Court finds that nervousness of the type Denny allegedly exhibited, including Denny's decision not to answer questions or otherwise engage with the Troopers, could arise from a variety of innocent factors based on the factual context here, and thus is not a significant factor in the reasonable suspicion analysis.

Nor does the Government overcome this problem by pointing to the alleged nervousness of the other passengers (i.e., Chivers and Lee) as an additional fact in the totality of circumstances. To start, while both Troopers agree that Denny acted nervous, they disagree over whether the other two men appeared nervous at all. Trooper Franz did not think either Chivers or the back-seat passenger (Lee) seemed nervous, but Trooper Hickey thought all three occupants were nervous. (Hr'g Tr. at #780, 822). This conflicting testimony undercuts the all-of-the-passengers-were-nervous argument, even if nervousness were a reliable indicator, which, as already noted, the Sixth Circuit has said is not the case. Nor, on a related note, does the Court make much of Trooper Hickey's observation that, in addition to appearing nervous, Chivers was trying to use his cellphone to record the encounter. (*Id.* at #832). It does not strike the Court as odd that a person may try to record his or her non-consensual encounter with law enforcement officers—indeed, YouTube is rife with such videos. Thus, this activity, assuming it occurred, adds little to the analysis.

*Driving A Rental Car.* At the time the Troopers went to question the men a second time, the Troopers also knew that Chivers was driving a rental car. Trooper Franz testified that he would have known Chivers was driving a rental car at least when the Troopers returned to the police cruiser for the first time because he was running Chivers' information through their system. (*Id.* at #773). But, here again, the mere fact that Chivers was driving a rental car, without more, does not indicate that he was engaged in criminal conduct. *See United States v. Pratt*, No. 3:12-00161, 2013 WL 3813509, at *8 (M.D. Tenn. July 22, 2013) ("[T]here is nothing inherently

28

suspicious about driving a rental car[.]"); *United States v. Beck*, 140 F.3d 1129, 1137 (8th Cir. 1998) (holding that there was "nothing inherently suspicious" about the defendant traveling in a rental vehicle). While it may be true that drug couriers often use rental cars when trafficking drugs, it is also true that people commonly rent cars for a variety of innocent reasons (traveling out of town, having a car break down, never owning a car, etc.). (*See* Hr'g Tr. at #740, 787–88). Without something more indicating criminal activity, the mere fact that Chivers drove a rental car carries virtually no weight in the reasonable suspicion analysis.

To be sure, later in the stop, the Troopers did discover an apparent discrepancy with the rental car agreement—Diana Coleman had rented the car, and the Troopers could not find Chivers listed as an authorized driver.[8] But they did not discover this discrepancy until *after* the Troopers questioned the men for a second time. They cannot use this after-acquired fact to justify reasonable suspicion at the time they originally diverted from their traffic stop activities to launch the separate criminal investigation, thereby prolonging the stop.

Nor does consideration of the three factors above in concert change the outcome. Not only is each factor innocent in its own right, but the same is true when considered in combination. Indeed, the time of travel (and thus the time at which the stop occurred)—i.e., the wee hours of the morning—may well have contributed to the passengers' nervousness, suggesting that the combination of those two factors carries

---

[8] As it turns out, it appears Chivers *was* an authorized driver. (*See* Mot. to Suppress Hr'g, Def.'s Ex. 1). That is certainly perplexing. But both Troopers testified they could not find Chivers' name on the agreement during the traffic stop.

little more weight than either one considered alone. And nothing about driving a rental car at 1:30 in the morning makes that activity any more suspicious on its face than driving such a vehicle at 4:00 in the afternoon. Or, at the very least, the Government, which bears the burden of establishing reasonable suspicion, offered no evidence suggesting that is the case.

Separately, the Government seeks to add the element of "conflicting stories" to the reasonable suspicion analysis. (*See* U.S. Post-Hr'g Br. at #936, 938–39). But that does not work either. That is because, at the time under consideration here—the first point at which both Troopers had diverted from the traffic stop—the Troopers were not aware of the allegedly conflicting stories. Rather, much as with the discrepancy in the rental agreement, Trooper Franz first learned of that issue later, and only *as a result of* his additional questioning of the passengers. But officers cannot use information they gain at a later point during an unlawfully prolonged stop to retroactively justify an earlier extension of time.

In any event, it is not at all clear to the Court that the stories "conflicted." Chivers said he was going to "visit family," while the other occupants said that they were "going to the clubs." But the same trip easily could have accomplished both purposes. As the occupants were not related, Chivers' family would not be family to the other passengers. And which of the two purposes a given passenger reports as *the* reason for the trip may well differ depending on whether it is that passenger's family or another passenger's family that they intend to visit.

30

In short, considering the factors alone or in conjunction, the Government has failed to show that the Troopers had a reasonable suspicion at the time they decided to suspend processing the ticket and instead launch a criminal investigation. Rather, the Court concludes that the Troopers acted on what could more accurately be described as an "ill-defined hunch" that three men traveling at night were up to "no good." *See Urrieta*, 520 F.3d at 578. Indeed, the Troopers' own characterization—that the vehicle's occupants were giving the Troopers a bad "vibe"—essentially concedes that point. (*See* Outside Car Camera at 8:43–8:45 (Hickey); Inside Car Camera at 11:41 (Franz)). Absent facts providing a reasonable basis supporting that "vibe," the Troopers lacked reasonable suspicion.

When both Troopers simultaneously diverted from the activities related to the traffic stop to launch a criminal investigation, they necessarily prolonged that stop. And, as the Court finds they lacked reasonable suspicion at the time the diversion occurred, the Troopers violated Chivers' Fourth Amendment rights.

## B. Deterring Law Enforcement From Prolonging Traffic Stops To Engage In Unrelated Fishing Expeditions Justifies Suppressing The Evidence In This Case.

A final issue remains. While the Fourth Amendment protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," U.S. Const. amend. IV, it says nothing about suppressing evidence obtained in violation of this command. *Davis v. United States*, 564 U.S. 229, 236 (2011). Rather, suppression arises from a "prudential" doctrine—the exclusionary rule—the Supreme Court created to "compel respect for the constitutional guaranty."

*Elkins v. United States*, 364 U.S. 206, 217 (1960). But exclusion is a "last resort," not a "first impulse." *Hudson v. Michigan*, 547 U.S. 586, 591 (2006). Moreover, exclusion of illegally obtained evidence is "not a personal constitutional right," nor is the exclusionary rule designed to "redress the injury" stemming from an unconstitutional search. *Stone v. Powell*, 428 U.S. 465, 486 (1976). Rather, the sole purpose of the rule is to deter future Fourth Amendment violations. *See Herring v. United States*, 555 U.S. 135, 141 (2009). And, in deciding whether to apply that remedy in a given case, the Court must consider not only the extent of such deterrence, but also the social costs of applying the exclusionary rule in this and like cases. *Id.* at 140–41.

Let's start with deterrence. The Court should apply the exclusionary rule only where it "result[s] in appreciable deterrence." *United States v. Leon*, 468 U.S. 897, 909 (1984). That is, this Court must consider the extent to which application of the exclusionary rule in a given case would deter future Fourth Amendment violations. *See United States v. Calandra*, 414 U.S. 338, 347–48 (1974).

This inquiry turns to a large extent on considerations of deliberateness and culpability. "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Herring*, 555 U.S. at 144. When officers exhibit "deliberate," "reckless," or "grossly negligent" disregard for Fourth Amendment rights, "the deterrent value of exclusion is strong and tends to outweigh the resulting costs." *Davis*, 564 U.S. at 238 (citing *Herring*, 555 U.S. at 144). By contrast, when the police act with an objectively "reasonable good-faith belief" that

32

their conduct is lawful, *Leon*, 468 U.S. at 909 (internal quotation omitted), or when their conduct involves only simple, "isolated," negligence, *Herring*, 555 U.S. at 137, the "deterrence rationale loses much of its force," and exclusion cannot "pay its way[.]" *Leon*, 468 U.S. at 919, 907 n.6.

This latter situation is typically referred to as the "good-faith exception" to the exclusionary rule. That is, if the officers acted in "good faith," then deterrence is not an issue, counseling against application of the rule. Importantly, however, the analysis of deterrence and culpability, and thus the analysis of good faith, is *objective*. *Herring*, 555 U.S. at 145. That is, a court need not find that officers acted with malice or ill-will, or that they otherwise had a wrongful intent, in order to find that suppression is warranted. Rather, the good-faith inquiry "is confined to the objectively ascertainable question whether a reasonably well-trained officer would have known that the search was illegal" in light of "all of the circumstances." *Leon* 468 U.S. at 922 n.23.

Separately, if application of the exclusionary rule could provide some incremental deterrent effect on the facts presented, that possible benefit also must be compared against the substantial social costs the rule imposes. *Illinois v. Krull*, 480 U.S. 340, 352–53 (1987). The principal cost of applying the rule is, "of course, letting guilty and possibly dangerous defendants go free—something that 'offends basic concepts of the criminal justice system.'" *Herring*, 555 U.S. at 141 (quoting *Leon*, 468 U.S. at 908). "The rule's costly toll upon truth-seeking and law enforcement objectives

presents a high obstacle for those urging its application." *Id.* (alterations omitted) (quoting *Pa. Bd. of Prob. & Parole v. Scott*, 524 U.S. 357, 364–65 (1998)).

Applying those principles here, the Court concludes that suppression is warranted. The Court does not dispute that, as the Government argues, the Troopers may well have acted with a subjective good faith intent in undertaking their investigation. They may have sincerely believed—based on their intuition, or a "vibe"—that the vehicle's occupants were reasonably likely to be engaged in criminal activity. But, as noted, a *subjective* good faith belief is not enough. And in assessing *objective* good faith, the key question is the clarity of the rule that they violated. Here, *Rodriguez*, which was decided more than two years before the stop at issue, established both (1) that *any* non-traffic-stop-related activity that prolongs a traffic stop must be supported by reasonable suspicion, and (2) that there is no de minimis exception, both of which the Sixth Circuit itself had at least suggested years before in *Urrieta. See* 520 F.3d at 578–79. A "well trained officer" after *Rodriguez* would know that rule, yet the Troopers violated it here. On these facts, application of the exclusionary rule will "discourag[e] officers from delaying a traffic stop to fish for evidence of criminal activity based on a hunch or a broadly generalized profile." *United States v. Cornejo*, 196 F. Supp. 3d 1137, 1158 (E.D. Cal. 2016). Thus, the Court finds that the deterrence factor counts in favor of applying the exclusionary rule.

But the Court must also consider social costs. In undertaking that analysis, though, the Court starts with the proposition that, when an officer's activities fail the objective good-faith inquiry, the deterrent value of suppression "tends to outweigh

the resulting costs." *Davis*, 564 U.S. at 238 (citing *Herring*, 555 U.S. at 144). That is particularly true in criminal cases. Indeed, courts have relied on the nearly ubiquitous application of the exclusionary rule in criminal proceedings as a reason for not extending it to other types of proceedings. *See Townes v. City of New York*, 176 F.3d 138, 145–46 (2d Cir. 1999) (citing Supreme Court cases that refused to extend the exclusionary rule into non-criminal contexts including civil tax proceedings, habeas proceedings, grand jury proceedings, INS deportation proceedings, and parole revocation proceedings). As the Supreme Court explained in *INS v. Lopez-Mendoza*, 468 U.S. 1032, 1042–46 (1984), given the deterrent effect arising from widespread use of the rule in criminal cases, little would be gained in deterrence terms from also applying it to these other types of proceedings. But that reasoning depends on courts generally applying the rule in the criminal context, at least absent some recognized exception to such application—for example, good faith, inevitable discovery, or the attenuation doctrine.

Here, the Government has failed to present any evidence to overcome the default position favoring application in a criminal proceeding. The only exception it raises is the good faith exception, and its shot at that falls short for the reason discussed above. Namely, the Government argues that the officers acted in subjective good faith, but the standard requires objective good faith.

As the Government has failed to identify any applicable recognized exception, the Court finds that social-cost considerations do not counsel against applying the exclusionary rule to the facts here, any more than they do in any other criminal

matter. For example, the cost case law most commonly identifies is that of letting a guilty defendant go free. *See, e.g.*, *Davis*, 564 U.S. at 237 (noting that the "bottom-line effect, in many cases, is to suppress the truth and set the criminal loose in the community without punishment"); *Hudson*, 547 U.S. at 591 (observing that suppressing evidence may "set[] … the dangerous at large"). But that cost is always incurred when excluding evidence in a criminal matter (or at least nearly always—sometimes the evidence is cumulative). Thus, consideration of that cost would seem to provide little additional guidance as to how to distinguish among various different types of Fourth Amendment violations to determine which do, and which do not, warrant suppressing evidence from a social-cost perspective.

Beyond that cost, other social-cost considerations may actually provide additional *support* for applying the exclusionary rule in cases like this one. Consider, for example, a situation where, unlike what happened here, there are significant indicia of criminal conduct, but officers commit a technical violation when obtaining a warrant before undertaking a search. In such circumstances, the deterrence that arises from excluding the resulting evidence will almost always come at the cost of freeing a guilty (or likely guilty) person. Thus, the social costs in that context are high. That is not to say that exclusion is never warranted in such settings, but it is to acknowledge that deterrence must be measured against a high bar in terms of cost.

Here, by contrast, the Troopers prolonged a traffic stop without reasonable suspicion. The vast majority of the traveling public—even those drivers who violate traffic laws—are not engaged in criminal behavior. Thus, prolonging a traffic stop for

additional investigative activities, without reasonable suspicion, largely will burden those who have committed no crime. Accordingly, a rule that incentivizes law enforcement officers to complete their traffic-stop-related tasks in a timely and efficient manner, prolonging the stop to investigate potential criminal activity only upon reasonable suspicion, benefits the public at large by serving the public's interest in free movement on the nation's roadways. This public benefit may offset at least some of the costs that society necessarily incurs whenever the exclusionary rule comes into play (i.e., potentially freeing a guilty defendant), thereby perhaps reducing the quantum of deterrence otherwise needed to justify its application in this setting.

And, with regard to that quantum of deterrence, it is also worth noting that it is unlikely that other forms of deterrence will arise for conduct of the type at issue here. *See Lopez-Mendoza*, 468 U.S. at 1045 (considering availability of "alternative remedies" in determining whether use of exclusionary rule is appropriate); *Yoc-Us v. Att'y Gen.*, 932 F.3d 98, 110 (3d Cir. 2019) (factoring in the lack of alternative remedies when determining whether to apply the exclusionary rule). After all, an innocent traveler who is wrongfully detained on the side of the road for some small additional amount of time as a result of an improperly prolonged stop is unlikely to incur enough by way of damages to make a civil suit worthwhile. *But see Hernandez*, 949 F.3d at 254 (reviewing jury verdict in § 1983 case predicated on traffic stop that allegedly violated Fourth Amendment under *Rodriguez*, but which led to arrest and lengthy pre-trial detention). Thus, absent the exclusionary rule, there would be little

disincentive for overly zealous law enforcement officers to act on "vibes" that are not supported by facts giving rise to a reasonable suspicion.

In sum, the Troopers here, perhaps with the best of intentions, engaged in activity that nonetheless violated established Supreme Court precedent about the permissible Fourth Amendment contours of a traffic stop. Specifically, they engaged in a criminal investigation that they admit was unrelated to the traffic violation, but that prolonged the stop; and the Court finds they lacked reasonable suspicion at the time they did so. As the improper extension of the traffic stop directly led to the discovery of the evidence at issue, this case falls squarely within the exclusionary rule's wheelhouse. Stated differently, the Court concludes that, on the facts here, the deterrent effect that arises from suppressing the evidence, on balance, outweighs the social costs that will result from such suppression.[9]

## CONCLUSION

Based on the foregoing, the Court **GRANTS** Chivers' Motion to Suppress Evidence (Doc. 58). The Court orders that the evidence obtained from the May 24,

---

[9] As a practical matter, enforcing the exclusionary rule here will not necessarily result in "set[ting Chivers] loose in the community[.]" *Davis*, 564 U.S. at 237. Although the Government noted at argument that suppression likely would lead to the dismissal of this case, Chivers is also wanted in two States (Ohio and Kentucky) on other criminal charges. In one of those jurisdictions (Kentucky), the charges are severe—three murders. Those alleged crimes are unrelated to the felon-in-possession charge here. Of course, the Court does not know, and offers no opinion on, whether Chivers has committed any of these other alleged criminal acts. Rather, the Court merely observes that enforcing the exclusionary rule as to the felon-in-possession charge here will not immediately result in Chivers' freedom, but instead only serves to transfer him to the custody of other sovereigns for consideration of the merits of those separate criminal charges.

2017 traffic stop, and in particular the weapon located in the vehicle, must be excluded.[10]

      **SO ORDERED.**

September 28, 2020
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**

---

[10] To allow the parties an opportunity to consider the appropriate path forward in light of this Order, the Court on its own motion **GRANTS** a brief continuance in this matter until October 8, 2020. The Court will hold a telephonic conference on that date, at a mutually convenient time, to discuss the status of this case. The Court finds that the ends of justice served by this brief continuance outweigh the interests of the Defendant and the public in a speedy trial, as failure to provide such a continuance would deprive counsel of adequate time to review this Order, to confer, and to advise the Court as to how the parties wish to proceed. Accordingly, the time elapsing from the entry of this Order until the October 8, 2020, shall be, and hereby is, **TOLLED**, pursuant to 18 U.S.C. § 3161(h)(7)(A), (B)(iv).